UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------x
BIGU HAIDER, and MOHAMMAD ISLAM Individually, on
Behalf of Themselves and All Others Similarly Situated, as
Class Representatives,

                                Plaintiffs,


          -against-


LYFT, INC.

                                Defendant.
------------------------------------------------------------------------------------x

          Plaintiffs Bigu Haider, and Mohammad Islam ("named plaintiffs"), individually, and on

behalf of themselves and all others similarly situated ("the Class") and as class representatives, by

and through counsel, Mirer, Mazzocchi & Julien, PLLC, and Zubin Soleimany, hereby allege as

follows:

                                <u>NATURE OF THE CASE</u>

          1.      This is a class action for breach of contract, fraud, and violation of GBL 349

brought against Defendant Lyft by Plaintiffs, Lyft drivers, on behalf of themselves and all other

similarly situated persons as stated below.


          2.      As more fully stated below, named Plaintiffs and the class they seek to represent

are Lyft drivers who are transportation industry workers.  They drive black cars in interstate

commerce as part of Lyft's New York City fleet.  As transportation workers engaged in interstate

commerce, New York City Lyft drivers are exempt from Section 1 of the Federal Arbitration Act,

9 U.S.C. § 1.  *See*, *Singh v. Uber Technologies, Inc.,* 939 F.3d 210 (3d Cir. 2019); *See*, *Cunningham

V Lyft, Inc.,* 2020 US DIST. LEXIS 53656, and the 2019 Supreme Court decision in *New Prime*

1

*Inc. v Oliveira,* 139 S.Ct. 532, which held that the issue of exemption from the FAA is for the Court, not an arbitrator, to decide.

3.     This case is being brought to compensate Plaintiffs and the class they will seek to represent, for Lyft having deducted from their pay, calculated as a percentage of each fare, the sales taxes and the Black Car Fund (workers' compensation) surcharge which should have been paid by the customer, and on top of the fare, not deducted from within the fare.

4.     These violations began in November 2014 and ended on August 8, 2017.  Lyft's decision to stop deducting these amounts from within the fare, and thus from driver pay was made shortly after Uber stopped the same practice on May 22, 2017.

5.     These violations have harmed each member of the class in an amount equal to approximately 11.375% of all class revenues in the relevant period.  This percentage is made up of the New York City sales tax rate of 8.875% and the Black Car Fund (BCF) surcharge of 2.5%, both of which should have been added to the fare for each trip, and not deducted from the driver.

6.     As will be stated more fully herein, Lyft owes Plaintiffs, and the class they seek to represent, the amounts improperly deducted from their pay prior to August 8, 2017.

7.     Plaintiffs bring this action on behalf of themselves and similarly situated current and former New York City Lyft drivers pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## PARTIES

**Plaintiff Bigu Haider**

8.     Plaintiff Bigu Haider is a resident of Flushing, Queens County, New York who has been driving for Lyft since in or about the summer of 2014.

2

9.      Plaintiff Haider worked for Lyft from in or about early September 2014 until July 2018.

10.     Plaintiff Haider successfully opted out of the arbitration clause in Lyft's Agreements.

11.     At all times relevant to this complaint, Plaintiff Haider was expected to and did provide services in Interstate Commerce by driving passengers into other states on a regular basis.

12.     Approximately 5% of the trips he performed while driving for Lyft crossed state lines. Thus he crossed state lines at least on or on a weekly basis,

13.     Because these interstate trips were typically longer than average trips, they accounted for an even higher percentage of Plaintiff Haider's total gross bookings while driving for Lyft.

14.     Moreover, several times a week he also transported passengers in interstate commerce by way of driving to or from John F Kennedy International Airport, LaGuardia Airport and/or Newark Liberty International Airport  to pick up or drop off passengers in interstate commerce.

**Plaintiff Mohammad Islam**

15.     Plaintiff Mohammad Islam ("Islam") is a resident of Astoria, Queens County, New York who has been actively working as a Taxi and/or Black Car driver and has worked as a Black Car driver for Lyft since in or about 2014.

16.     Islam has driven for Lyft from in or about August 2014 to the present.

17.     At all times relevant to this complaint, Plaintiff Islam was expected to and regularly did provide services in Interstate Commerce by driving passengers into other states on a regular basis.

3

18.     Approximately 5% of the trips he performed while driving for Lyft crossed state lines.

19.     Thus he crossed state lines at least on or on a weekly basis,

20.     Moreover, several times a week he also transported passengers in interstate commerce by way of driving to or from John F Kennedy International Airport, LaGuardia Airport and/or Newark Liberty International Airport   to pick up or drop off passengers in interstate commerce.

**Defendant Lyft, Inc.**

21.     Lyft, Inc. ("Lyft") is a Delaware corporation.

22.     Lyft maintains its headquarters at 185 Berry Street, San Francisco, CA 94107.

23.     Lyft operates two (2) subsidiaries in New York, each of which currently holds a New York City Taxi Limousine Commission (TLC) license to operate a For-Hire Vehicle (FHV) Base.

24.     The Lyft workforce is managed through these bases as they are responsible for the dispatch of each of the trips to the Plaintiffs.

25.     The Lyft FHV base subsidiaries are responsible under the N.Y. Tax Law for collection and payment of the 8.875% sales tax on black car rides.

26.     Similarly, under the New York Executive Law, each FHV base is responsible for collecting and remitting a 2.5% surcharge on rides to the BCF, an injured workers' fund for black car drivers.

**JURISDICTION AND VENUE**

4

27.     Jurisdiction is proper as this Court under 28 USC 1332 based on diversity of citizenship. The amount in controversy exceeds $75,000.

28.     Defendant Lyft is subject to personal jurisdiction in the State of New York as Lyft does business in New York.

29.     Venue is proper in this District because Defendants conduct business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## BACKGROUND FACTS

### All New York City Lyft Drivers Are Parties To Standard Contracts With Lyft

30.     Lyft operates in New York City as a group of two Black Car bases, each of which is licensed by the New York City Taxi and Limousine Commission (TLC).

31.     These bases are subsidiaries of Lyft, which is the owner of the Lyft app.

32.     All black car vehicles operating in New York City must be affiliated with a base in order to accept dispatches, but drivers are permitted to accept dispatches from any base under TLC rules.

33.     All requests for Lyft service are made through the Lyft smartphone application (the Lyft "app") and are dispatched to Lyft drivers through Lyft's centralized dispatch network that also operates via the Lyft app.

34.     At all times relevant to this complaint, in order to accept dispatches from Lyft, drivers entered into a contract with Lyft which specified that Lyft would set the fare based on a base-charge-plus-time-plus-distance formula, that Lyft will collect the monies, and pass through to drivers their earnings, which were to be net of Lyft's service fee.

35. At all times relevant to this complaint, Lyft effectively paid its drivers a percentage of the fare for each trip. Lyft passengers paid a full fare amount to Lyft, which Lyft, jointly with the FHV bases, remitted to the Driver after deducting its fee of 20% or 25%.

36. Drivers' rates of pay were set forth in the form of fare rates published on its website and its app, and by the commission rates/"Lyft Fees" charged to drivers, established by Defendant.

37. At all times relevant, Defendant made additional deductions from within passengers' fares equal to the cost of sales taxes and the BCF surcharge. These deductions from drivers' pay were made in violation of the contracts between Lyft and New York City drivers.

38. Specifically, in order to receive Lyft dispatches, all Plaintiffs and similarly situated persons were required to electronically "accept" Lyft's "Terms of Service" (hereinafter, "the Agreement" or "the Contract") on their phones.

39. The rates to be charged for trips in a given City are set forth in a separate section of the Lyft Driver website and are listed on the website for each City that Lyft serves.

40. Trip fare schedules were subject to unilateral change by Lyft and percentages due to drivers under the Agreement could be changed unilaterally by Lyft in subsequent addendums offered to drivers. One contract even notes that such terms could be amended simply by Lyft updating the terms on the website that hosted Lyft's Terms and Conditions.

41. In order to receive dispatches after Lyft issued a new Contract, a driver was required to agree to the new contract, which appeared on his or her phone, before any new dispatch could come in.

42. All drivers were bound by contract with Lyft to provide driving services in exchange for receipt of a percentage of the fare collected by Lyft from passengers.

6

**<u>Lyft Has Structured its New York City Business Such That New York City-based  Lyft Drivers are  Required to Engage in Interstate Commerce</u>**

43.     At all times relevant, named Plaintiffs and members of the class they seek to represent were expected to and did drive passengers across state lines.

44.     Lyft's business model contemplates that Lyft's New York City Drivers are expected to perform interstate trips as part of their regular work.

45.     At all times relevant, Lyft's customer-facing websites have advised customers about the taxes and surcharges that are added to the fare for out-of-state trips. The current website states: "Return tolls will be added to Westbound trips through the Holland Tunnel, Lincoln Tunnel, George Washington Bridge, Goethals Bridge, and Outerbridge Crossing.  A $20 surcharge which includes tolls, as added to the fare on all trips between New York and New Jersey.  If the trip begins in New Jersey and crosses the Verrazano Narrows Bridge, there is an additional $19 surcharge, for a total of $39 added to the price which again includes tolls. https://www.lyft.com/rider/cities/new-york-city-ny.    In 2017 Lyft's customer facing website similarly states: "Heads up: $20 surcharge will be added to all trips between New York and New Jersey inclusive of tolls." https://www.lyft.com/cities/new-york-city-ny (Date accessed: May 30, 2017).

46.     New York City-based Lyft drivers routinely transport passengers between New York and New Jersey.

47.     Specifically, in entering ride locations, passengers may choose any destination within 100 miles of their pick-up location, irrespective of the state of the destination.

48.     Lyft's policies state that trips originating in New York City may extend as far as 100 miles.

49.     Thus, New York City-based Lyft drivers may be dispatched to locations in New Jersey, Connecticut, or Pennsylvania.

50.     Once a driver receives a dispatch, Lyft specifies the pick-up location, but withholds the drop-off location until the passenger has entered the vehicle.

51.     Drivers are instructed that they will be penalized should they not accept a Lyft dispatch. If a driver refuses a trip after learning of the destination, Lyft considers such a refusal to be a "cancellation."

52.     Lyft has maintained a deactivation policy that stated that drivers' accounts could be deactivated for excessive cancellations.  Specifically, a tutorial provided for Lyft drivers states "If you cancel 15 or more of your last 100 accepted rides, not including passenger no-shows, your driver account could be at risk." Accordingly, no driver had the option to exclude performing interstate trips, without risking further exposure to deactivation.

53.     Thus, acceptance of interstate trips was a term and condition of Plaintiffs' access to Lyft dispatches.

54.     Named Plaintiffs were required to perform interstate trips as a term and condition of his contract with Lyft.

55.     Named Plaintiffs did in fact perform interstate trips.

## NEW YORK TAX LAW

56.     Lyft rides are subject to New York State sales tax.

57.     Within New York City, the tax rates for state and local taxes and BCF are 8.875% and 2.5% respectively. *See*, N.Y. Tax L. §§1105, 1109; N.Y.C. Admin. Code §11-2001 (Requiring collection of 4% statewide sales tax, 0.375% sales tax within the Metropolitan Commuter

Transportation District, and 4.5% local sales tax within New York City); Plan of Operation of the New York Black Car Operators' Injury Compensation Fund, Inc., Article VIII, Section 6.

58.     State law and regulations do not permit a black car base, or any vendor for sales tax purposes, to treat the sales tax as part of the cost of services.

59.     Rather, the law requires sales tax amounts to be charged separately and on top of the sales price/fare. N.Y. Tax L. § 1132 (a); 20 N.Y.C.R.R. § 532.1 (b).

60.     Similarly, no person required to collect tax is allowed to absorb the tax within the sales price. N.Y. Tax L. § 1133; 20 N.Y.C.R.R.  532.1(c).

61.     The N.Y. Tax Law requires sales tax to be charged to the customer and stated separately on customer receipts.

62.     By dispatching trips under the Agreements, Lyft, jointly with Lyft's subsidiary Black Car bases, were the vendors of transportation services under applicable New York Tax Law.

63.     As the vendor, Lyft and its subsidiary Black Car bases were responsible to collect and remit sales tax.

64.     At all times relevant, Lyft was required to, and acknowledged that it was responsible for complying with the Tax Law.

65.     Indeed, as Lyft completely controls the electronic payment process, there would be no way for the driver to collect amounts for tax independently.

66.     In the relevant period until August 8, 2017, Lyft customer receipts show that the Fare charged to the customer represents the consumer sales price for transportation services, based on the distance and time for each trip.

9

67.     New York City Lyft customer receipts issued prior to August 8, 2017 list only a single amount, a total un-itemized sales price, which represents the cost of the fare, with no mention at all of the sales tax or BCF surcharge.

68.     When tax is not listed on a customer receipt, the price listed is deemed the amount of the sales price, not including tax, under New York Tax Law and regulations. *See*, 20 N.Y.C.R.R. § 532.1(b)(3).

## BREACH OF JULY 28, 2014 CONTRACT: LYFT'S BREACH OF CONTRACT FROM NOVEMBER 24, 2014 THROUGH NOVEMBER 2, 2015

69.     Pursuant to New York City drivers' contracts with Lyft, drivers were entitled to receive the fare charged to the customer, net of Lyft's Fee, or commission, on each ride.

70.     During the relevant period, drivers contracted with Lyft to pay Lyft Fees of up to 20% of each fare to Lyft.

71.     As set forth in detail below, from the time Lyft entered the New York City market in 2014 until August 8, 2017, Lyft illegally deducted the taxes and the BCF Surcharge from the drivers' pay, in violation of its contract to deduct only Lyft Fees.

72.     The July 2014 contract set forth both the relationship between the passenger and Lyft and between the driver and Lyft.

73.     This contract does not have numbered sections, but rather, sections are divided by subject headers.

74.     Under the subject header "Payments," sub-header "Administrative Fee," the July 2014 contract states, in relevant part:

Lyft receives an administrative fee of up to 20% (the "Administrative Fee") of each Charge or Donation of more than $0 that a Rider makes to a Driver, net of the $1 per ride trust & safety fee (the "Trust & Safety Fee"). For the sake of clarity, the

10

Administrative Fee is assessed on a Donation or Charge, as applicable, after the assessment of the Trust & Safety Fee.

75.     The July 28, 2014 Agreement states plainly that Lyft would only retain up to 20% from each Fare before remitting the remainder of the Fare to the driver.

76.     That is, Lyft referred to its fee owed as an "Administrative Fee" of up to twenty percent.

77.     Other than the Trust and Safety Fee, which does not apply to trips originating in New York City, Lyft was not permitted to retain any monies in addition to the Administrative Fee.

78.     In New York City, however, since at least November 24, 2014, Lyft has additionally retained various amounts from within each Ride Fare to pay Lyft's obligations for combined state and local sales taxes, and for the BCF surcharge.

79.     Indeed, Lyft has admitted that it does this.

80.     Specifically, on November 18, 2014, Seth Melnick, Lyft's "NYC Market Manager" e-mailed Lyft's New York City drivers to inform them that Lyft would begin taking two additional deductions from driver pay, on top of Lyft's then-20% Administrative Fee or "commission."

81.     Quite plainly, the e-mail explained that Lyft would take these deductions in order to cover the cost for sales tax and the Black Car Fund, stating:

> When we launched in NYC, we applied the same 20% commission that we've had across the country. NYC's regulations have different requirements than anywhere else, since they collect both an 8% local sales tax as well as a 2% fee for the Black Car Fund. To cover these costs, we will be adding 10% to Lyft's commission beginning Nov. 24. This will bring us in line with industry standards.

82.     Although Melnick's e-mail unequivocally stated that the 8% and 2% deductions represented amounts required to be paid for sales tax and the Black Car Fund, this 10 percent addition to the "Commission" appeared on driver pay statements as two discrete deductions of 8% and 2%, respectively, each labelled "Ride Surcharge from Driver." These "Ride Surcharges,"

totaling 10% of each fare were levied in addition to the contractual Administrative Fee which was indicated on the driver pay statements as "Lyft Fees."[1]

83.     Beginning in April 2015, Lyft increased the 8% "Ride Surcharge from Driver" to an 8.875% "Ride Surcharge from Driver" and increased the 2% "Ride Surcharge from Driver" to a 2.5% "Ride Surcharge from Driver," thus precisely matching the sales tax and BCF surcharge amounts required to be levied on Black Car services provided in New York City.

84.     Lyft's practice of retaining monies in addition to the 20% Administrative Fee, from November 24, 2014 through November 2, 2015—the last day the July 28, 2014 contract was in force—was a clear violation of the contract.

85.     Nor did the November 18, 2014 nor April 6, 2015 emails constitute a valid amendment of the July 28, 2014 contract, which required that, for any amendment, the new terms would be either listed on the Lyft Platform, also known as the "Lyft App," or provided in writing and signed by drivers.  The July 28, 2014 contract provides in relevant part:

> We may amend this Agreement at any time by posting the amended terms on the Lyft Platform. If We post amended terms on the Lyft Platform, You may not use the Services without accepting them. Except as stated below, all amended terms shall automatically be effective after they are posted on the Lyft Platform. This Agreement may not be otherwise amended except in writing signed by You and Lyft.

---

[1] It is unclear why, during this period, Lyft collected only an 8% Ride Surcharge from Driver for sales tax, and a 2% Ride Surcharge from Driver for the Black Car Fund, when the proper amounts within New York City are 8.875% and 2.5% respectively. *See*, N.Y. Tax L. §§1105, 1109; N.Y.C. Admin. Code §11-2001 (Requiring collection of 4% statewide sales tax, 0.375% sales tax within the Metropolitan Commuter Transportation District, and 4.5% local sales tax within New York City); Plan of Operation of the New York Black Car Operators' Injury Compensation Fund, Inc., Article VIII, Section 6.
Indeed, on April 6, 2015, Lyft emailed its New York City drivers to inform them that Lyft was increasing Lyft's commission by 1.4%.

86.     Consistent with the additional charges not being a permissible amendment to increase the Administrative Fee, such charges appeared as two discrete charges on contemporaneous driver pay records, each labelled "Ride Surcharge from Driver."

87.     Thus, from on or about November 24, 2014 to on or about April 5, 2015, Lyft breached the July 2014 contract to Plaintiffs' detriment by deducting an extra approximately 10% of the total Fare more than allowed by the terms of the contract.

88.     Further, from on or about April 6, 2015 to on or about November 3, 2015, Lyft breached the July 2014 contract to Plaintiffs' detriment by deducting an extra approximately 11.4% of the total Fare more than allowed by the terms of the contract.

**LYFT SUBSEQUENTLY SOUGHT  TO COVER UP ITS BREACH OF THE JULY 2014 CONTRACT**

89.     Thereafter, in order to disguise its breach of contract, Lyft consolidated the three charges—two of which were unlawfully retained— into a single item, labelled "Lyft Fees."

90.     When "Driver Pay Records" from this period were printed after Lyft overhauled its payment practices in August 2017, the newly printed records are not identical to the records saved earlier, with the earlier records reflecting Lyft's actual practice of taking two impermissible fees in addition to the administrative fee, while later records hid this practice.

91.     Specifically, the driver pay records for these trips, when accessed contemporaneously, or prior to Lyft's August 2017 overhaul of its payment practices, showed three deductions from the ride fees: a 20% deduction for "Lyft Fees," one "Ride surcharge from driver" of 2.5% of the Ride Fees, and one "Ride surcharge from driver" of 8.875% of the Ride Fees.  These are the exact percentages of the BCF surcharge and sales tax, respectively.  *See* Sample Driver Trip Record from July 19, 2015, below.



92.    Oddly, and with no explanation the same trip record for the exact same trip, when accessed in October 2017, after Lyft overhauled its driver payment practices, showed only one deduction from the Ride Fees, a "Lyft Fee" of approximately 31.4%.  *See* below.



## FRAUD AND DECEPTIVE PRACTICE ALLEGATIONS

93.    On November 3, 2015, Lyft issued a new contract that characterized the tax and BCF amounts as an administrative fee.

94.    That is, where previously the contract had permitted Lyft to take only their Lyft fee, and in violation thereof, Lyft deducted additional amounts, after November 3, 2015 Lyft instead sought to deceive New York drivers by disguising tax and BCF deductions as   higher "Administrative Fees" pursuant to the contract.

95.    As  stated herein, the increase in "Administrative Fees" per the contracts in force from November 3, 2015 to August 7, 2017 was precisely equal to the Tax and BCF sums.

15

96.     As stated herein, Lyft misled drivers by creating a fraud collateral to its contracts because Defendant could not openly contract for drivers to pay the tax and BCF amounts, as such clause would be forbidden by N.Y. Tax Law and N.Y. Executive Law, which set forth nondelegable duties to Lyft, as a vendor, to pay sales tax and the BCF surcharge, respectively.

97.     Further, instead of merely charging passengers tax and  the BCF surcharge in addition to the fare, as stated herein, in order to remain competitive with their main competitor, Uber--who did not list taxes and BCF on customer receipts at various times--and in an effort to maintain low passenger fares  to increase their market share, Lyft illegally required drivers to pay tax and the BCF surcharge on passenger rides by engaging in a fraudulent and deceptive practice of mischaracterizing an illegal contract provision—that drivers must pay tax and the BCF surcharge—as an administrative fee.

98.     Consistent with the market rationale for this deception of drivers, during this period passenger receipts made no mention of tax and BCF.

99.     Further indicative of this deceptive misrepresentation contained in the contract, driver trip records show three discrete fees deducted from the fare price, two of which are equal to precisely the sales tax and BCF surcharge amounts.

100.    Thus, the driver trip records from this period amount to admissions of the deceptive mischaracterization contained in the contract.

101.    As a result of Defendant's fraudulent and deceptive misrepresentations, Plaintiffs and the putative class were harmed in a sum equal to 11.4% of the total fares on every ride performed in this period, as set forth in detail below.

102.    This fraudulent practice was continuous until August 7, 2017 (the "August 2017 overhaul")  when Defendant finally began charging passengers tax and the BCF surcharge directly

16

and displaying these sums on passenger receipts—finally complying with their obligations under the tax law. At this time, Defendant also reduced the Administrative fee to reflect the actual non tax, bona fide Administrative Fee of 20-25%.

103.    Defendant made this change after its main competitor, Uber, changed its practice to charge tax and BCF as required under the Tax Law, at which point there was no longer a rationale for Lyft's noncompliance in order to remain competitive with Uber.

104.    Finally, just as it had with its contract violation, Defendant sought to cover up its fraud, by spoliating contemporaneous records which admit its illegal acts, and replacing them with false records.

105.    Defendant's spoliation of records establishes that its fraud and deception was at all times willful.

### The November 3, 2015 Contract: Lyft Misrepresents The Deductions For Sales Tax And The BCF Surcharge By Calling Them An Administrative Fee For Operating Costs And Showing Them As Surcharges On Driver Trip Records

106.    On November 3, 2015, Lyft issued a new contract.  Regarding driver pay terms, this contract provided that "you agree to pay Lyft (and permit Lyft to retain) a fee of up to 20% (the "Administrative Fee") of the Ride Fees paid by Riders."  In addition, the contract stated, "In New York you agree to pay Lyft an Administrative Fee of up to 31.4% of Ride Fees to cover additional operating costs."

107.    The driver trip records for these trips, when accessed contemporaneously, or saved prior to Lyft's August 2017 overhaul of its payment practices, showed three deductions from the ride fees: a 20% deduction for "Lyft fees," one "Ride surcharge from driver" of 2.5% of the Ride

fees, and one "Ride surcharge from driver" of 8.875% of the Ride Fees. *See* Sample Driver Trip Record from Dec. 21, 2015, below.



108.    The same driver trip record for the exact same trip, when accessed in October 2017, after Lyft overhauled its driver payment practices in August 2017, showed only one deduction from the Ride Fees, a deduction for "Lyft Fees" of 31.4%.  *See* below.



109.    During this period, Lyft's passenger-facing receipts made no reference to the sales

tax nor to the BCF surcharge.

110.    Beginning on January 1, 2016, Lyft began charging new drivers an Administrative

Fee or Commission of 25% of each Ride Fee.

**The February 2016 Contract: Lyft Still Misrepresents Deductions For Sales Tax And The BCF
Surcharge As "Surcharges" On The Driver Trip Records**

111.    In February 2016, Lyft issued a new contract.

112.    The February 2016 contract stated that, "As a Driver you will receive applicable

Ride Fees (net of Lyft's Administrative Fee, as discussed below) and any tips."  This contract is

19

silent on the amount of Lyft's administrative fees, but it does give Lyft the right to set prices on the drivers' behalf for all charges attributable to the transportation services.  The contract states that Administrative Fee schedules would be separately communicated, and that Lyft reserved the right to change the Administrative Fee at any time.

113.    Receipts for both drivers and riders during this period make no reference to the payment of sales tax or the BCF surcharge.  Nonetheless, the amount of total deductions from within the "Ride Fees" remained approximately 31.4% for drivers who had signed up to drive for Lyft before January 1, 2016, and remained approximately 36.4% for drivers who signed up to work for Lyft after January 1, 2016.

114.    A driver trip record for a trip taken on June 5, 2016 again shows "Lyft Fees" levied separately from two surcharges, showing a 20% deduction for "Lyft fees," one "Surcharge" of 2.5% of the Ride Fees, and one "Surcharge" of 8.875% of the Ride Fees.  *See* Sample Driver Trip Record from June 5, 2016, below.



115.    The same driver trip record for the exact same trip, when accessed after Lyft's overhaul of driver payment practices in August 2017, shows only one deduction, which is the aggregate of all the three prior charges, simply labeled "Lyft Fees." *See* below.



116.     In both records, the amount deducted from the within the Ride Fees equals approximately 31.4% and on neither receipt is there any reference to sales tax or the BCF surcharge.

### The September 2016 Contract: Lyft Still Misrepresents Deductions For Sales Taxes And BCF Surcharge As "Surcharges" On The Driver Trip Records

117.     In September 2016, Lyft issued a new contract to its drivers.  This contract states, at Section 5, that "in exchange for permitting you to offer your Services through the Lyft Platform and marketplace as a Driver, you agree to pay Lyft (and permit Lyft to retain) a fee based on each transaction in which you provide services (the 'Commission')."  This contract also states that Lyft would communicate the specific "Commission Schedule" to drivers through the Driver portal.

22

118.    During this period, Lyft's Commission rates of 20% or 25% (depending on the driver's start-date) remained in effect.

119.    Lyft's Commission Schedule during this period also stated, "For drivers in New York: Lyft also collects an 11.4% administrative charge for operational expenses and the Black Car Fund."

120.    The contract further states, at Section 5, that "you acknowledge and agree that [payments made to drivers] shall not include any interest and will be net of any amounts that we are required to withhold by law."

121.    Receipts for both drivers and riders during this period as well make no reference to the payment of sales tax or the BCF surcharge.  Nonetheless, the amount of total deductions from within the "Ride Fees" remained approximately 31.4% for drivers who had signed up to drive for Lyft before January 1, 2016, and remained approximately 36.4% for drivers who signed up to drive for Lyft after January 1, 2016.

122.    A driver trip record from December 18, 2016 again shows the deduction of "Lyft fees" separate from two other surcharges deducted from within the Ride Fees, showing a 20% deduction for "Lyft Fees," one "Surcharge" of 2.5%, and one "Surcharge of 8.875%.  *See* Sample Driver Trip Record from December 18, 2016, below.



123.    The same driver trip record for the exact same trip, when accessed after Lyft overhauled its payment practices in August 2017, shows only one deduction of approximately 31.4%, which is the aggregate of all three of the prior charges, labeled "Lyft Fees." *See* below.



124.    In both cases, the total amount deducted from within the Ride Fees equals 31.4%

and on neither receipt is there any mention of taxes of the BCF surcharge.

**The May 24, 2017 Commission Schedule: Lyft Still Misrepresents Deductions For Sales Tax And BCF Surcharge As "Surcharges" On The Driver Trip Records**

125.    On May 24, 2017, Lyft issued a new Commission Schedule, not merely posted on

the Driver Portal, or Lyft website, but published as a static document.[2]

---

[2] Prior to this time, Lyft had not provided drivers with static copies of their Agreements or Commission Schedules, either in paper or electronic format, and drivers are currently unable to access prior versions of the Agreement and Commission Schedule through the Driver Portal.

126. The main purpose of the May 24, 2017 Commission Schedule was to establish the payment rates for trips, depending on whether or not Lyft charged the passenger for the trip based on per-mile and per-minute rates (a "Variable fare") or charged the passenger for the trip based on a static, up-front price (a "Quoted fare").

127. The Commission Schedule continued the same 20% or 25% rates discussed *supra*, as well as the 11.4% "Administrative Fee," when passengers were charged a Variable fare.

128. However, the Schedule states that when passengers are charged a Quoted fare, the driver will still be paid based on what the fare would have been if it were charged on a per-mile and per-minute basis as a Variable fare, and that Lyft would calculate and deduct its 20% or 25% Commission and 11.4% Administrative Fee based on the hypothetical Variable fare amount for such trips.

129. The May 24, 2017 Commission schedule did not change the September 2016 contract other than to amend the Commission Schedule.   Issuing this Commission Schedule was likely the result of Lyft beginning to use Quoted fares in addition to Variable fares.

130. The Receipts for both drivers and riders during this period make no reference to the payment of sales tax or the BCF surcharge.  Nonetheless, the amount of total deductions from within the "Ride Fees" remained approximately 31.4% for drivers who had signed up to drive for Lyft before January 1, 2016, and remained approximately 36.4% for drivers who signed up to drive for Lyft after January 1, 2016.

131. A driver trip record from June 1, 2017 again shows the deduction of "Lyft Fees" separate from two other surcharges deducted from within the Ride Fees, showing a 20% deduction for "Lyft fees," one "Surcharge" of 2.5%, and one "Surcharge" of 8.875%.  *See* Sample Driver Trip Record from June 1, 2017, below.

26



132.    The same driver trip record for the exact same trip, when accessed after Lyft overhauled its payment practices in August 2017, shows only one deduction of approximately 31.4%, which is the aggregate of all three of the prior charges, labeled "Lyft Fees." *See* below.



133.    In both cases, the amount deducted from the driver equals approximately 31.4%
and neither receipt makes any mention of taxes or the BCF surcharge.

134.    Despite Lyft's unannounced alterations of driver trip records, it is clear from Lyft's prior
statements, and from the percentage amounts of its "Surcharge" deductions, that Lyft has been deducting a
percentage of Fares for itself, and deducting two other amounts from within the fare for the payment of
sales tax and the Black Car Fund surcharge.

135.    When Lyft first began collecting 8% and 2% deductions, it never claimed that such
fees were part of the "Commission" or "Administrative Fee," but admitted that such deductions

were additional deductions from within the fare and were for the payment of sales tax and the BCF surcharge.

136.    Those amounts attributable to sales tax and the BCF surcharge were, until August 8, 2017, always taken from within the amount that Lyft designated as the price for transportation services.

137.    Furthermore, Lyft charged these same so-called surcharges or administrative fees on trips to other states where sales tax was not required to be paid.   In those instances, the amounts deducted were not needed for sales tax and Lyft enriched itself at the Plaintiffs' expense.

**On August 8, 2017, After Three Years Of Deducting Sales Tax And The BCF Surcharge From Within Drivers' Pay, Lyft Ends These Deceptive Deductions To Parallel The Same Change Made By Uber**

138.    On August 8, 2017, Lyft issued a new Commission Schedule and abruptly eliminated its use of the 11.4% Administrative Fee/surcharge fee.

139.    That same day, Lyft e-mailed its New York City drivers to explain that, as of that date, Lyft was "simplifying the rate structure in New York City by removing the 11.4% administrative fee and adjusting rates."

140.    This e-mail includes a comparison of side-by-side fare calculations for the same hypothetical trip under both the old and new fare calculation structures. The e-mail indicates that under the pre-8/8/17 structure, Lyft deducted an 11.4% "Lyft Administrative Fee" in addition to a Lyft Fee from within the amount considered to be the Fare.

141.    This e-mail indicates that, even though Lyft lowered the per-mile, per-minute and base fare rates for driver pay, drivers would still make more under the new model because the "Lyft Administrative Fee" would no longer be deducted from driver pay, which had previously been a factor in reducing driver pay.

142.    The e-mail, combined with Lyft's earlier representation that such fees represented the sales tax and Black Car Fund are a clear admission that Lyft's pre-August 8, 2017 practices involved the illegal deduction of sales tax and BCF from within the price of the fare, to the drivers' detriment.

143.    At the same time, Lyft finally began displaying sales tax and BCF amounts to customers on customer receipts, showing both amounts properly added on top of the sales price listed as the cost for transportation services.

144.    Defendants owe Plaintiffs and the class they seek to represent the amount calculated to be wrongfully withheld from their pay.

145.    When Lyft entered the New York market in 2014, its main competitor was Uber.

146.    At that time, Uber's practice was to deduct sales tax and the BCF surcharge from within driver pay, in addition to its 20-28% commission.  Additionally, Uber's customer-facing receipts made no reference to sales tax and the BCF surcharge.

147.    Uber, however, did not mischaracterize these charges as "administrative fees."  On driver pay records, Uber was open about the fact that it was deducting sales tax and the BCF surcharge from the drivers' pay.[3]

148.    To the extent that Uber was forcing its drivers to "eat the cost" of the sales tax and BCF surcharge, this was done, on information and belief, to keep the cost of its total customer fare pricing lower than it would have been if Uber had charged tax and BCF on top of the fare amount, as required by New York tax law, so as to attract customers and build up market share.

---

[3] This practice constitutes a breach of Uber's contract with its drivers, and counsel for Plaintiffs in this matter are also litigating this issue in *Aleksanian et al v. Uber Technologies et al.*, 1:19-cv-10308 (S.D.N.Y.).

149.    When Lyft entered the New York City market, it followed Uber's lead and structured its fare, payment, and sales tax practices in a similar manner.

150.    In May of 2017, Plaintiff Haider, who was also a plaintiff in *Haider v. Uber Technologies, Inc., et al.*, 1:16-cv-04098 (S.D.N.Y.) (AKH), filed a second amended complaint in that case, in which he again claimed that the deduction of sales tax and the BCF surcharge was not only a breach of his contract with Uber, but also that Uber's practice of treating the tax and BCF amounts as within the sales price of its rides violated N.Y. Tax Law.  Specifically, the second amended complaint added citations to the particular statutes and provisions of the N.Y. Tax Law and N.Y.C.R.R. prohibiting the use of such a "tax-included" method.

151.    Within 10 days of filing this amended complaint, Uber had completely overhauled its payment practices, abandoning the use of its tax-included method and no longer removing sales tax and BCF from within the amount designated as the fare.

152.    At this time, there was significant press coverage of Uber's payment practices regarding its driver contract and treatment of the sales tax and BCF surcharge.

153.    Notably, the New York Times published three in-depth stories between May and July of 2017 on the scope and questionable legality of Uber's practices.  Some of these stories also raised questions about Lyft's treatment of the tax and BCF surcharge as it related to whether Lyft was paying its drivers properly.

154.    A May 23, 2017 article in the New York Times noted that "Lyft [] appears to deduct the sales tax from drivers' earnings as well. A Lyft driver's receipt from July 24, 2016, depicts an overall fare of $16.34 and two deductions labeled "Ride Surcharge From Driver" that precisely equal the black-car surcharge and sales tax amounts."  Noam Scheiber, *Uber to Repay Millions to Drivers, Who Could Be Owed Far More*. N.Y. TIMES (May 23, 2017), available at

31

https://www.nytimes.com/2017/05/23/business/economy/uber-drivers-tax.html (Last accessed: Feb. 26, 2019).

155.    On July 5, 2017, a follow-up article in the New York Times stated, "Lyft [] deducts 11.4 percent from the fares received by drivers in New York, which appears to largely cover the amounts owed for sales tax and workers' compensation fund."  Lyft's spokesman, Adrian Durbin, told the Times, "We do not collect sales tax from drivers."  Noam Scheiber, *How Uber's Tax Calculation May Have Cost Drivers Hundreds of Millions*.  N.Y. TIMES (July 5, 2017), available at   https://www.nytimes.com/2017/07/05/business/how-uber-may-have-improperly-taxed-its-drivers.html (Last accessed: Feb. 26, 2019).

156.    Roughly a month after that article was published, consistent with Uber's payment and tax treatment overhaul, Lyft followed suit, and stopped deducting 8.875% and 2.5% "surcharges" from within each fare, and began clearly assessing on customer receipts an 8.875% amount which it labeled as the sales tax, and a 2.5% amount which it labeled as the BCF surcharge on top of each fare, as required by New York law.

## COMMON ALLEGATIONS RELATING TO DEFENDANT'S  BREACH OF CONTRACT, FRAUD AND DECEPTIVE PRACTICE

157.    At all times relevant to this complaint, all drivers who worked for Lyft at any time between November 2014 and August 8, 2017 were subject to the improper deduction of Sales Tax and Black Car Fund surcharges from their pay.

158.    At all times relevant to this complaint, state law prohibited Lyft from including the amount of the taxes and BCF surcharge within the price of the fare.

159.    At all times relevant to this complaint, it was illegal for Lyft to shift the payment of sales tax and the BCF surcharge from the consumer to the drivers.

160.     From November 24, 2014 to November 3, 2015, Lyft deducted either an extra 10% or 11.4% from drivers' pay in violation of the terms of the contract.

161.     At all times relevant, after November 3, 2015 the contracts given to Lyft drivers misrepresented the amounts taken from drivers, which equaled the amounts of sales taxes and the BCF surcharge, as administrative fees or other surcharges. Thus Lyft engaged in a fraud on the drivers subjecting them to a loss of approximately 11.4% of each fare.

## CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 23

162.     Although named Plaintiff Haider has opted out of the arbitration provision of the employment contract, the arbitration agreement is not binding as all named Plaintiffs and members of the class they seek to represent are transportation workers engaged in interstate commerce and thus exempt from section 1 of the Federal Arbitration Act.   Named Plaintiffs bring claims on behalf of themselves and a class of Lyft drivers who worked for Lyft in New York City at any time between November 24, 2014 and August 8, 2017.

163.     Plaintiffs' claims are brought pursuant to Rule 23 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) so as to remedy violations of the contract discussed above. Plaintiffs bring this case on behalf of themselves and on behalf of all others similarly situated in New York, hereafter, the "class action Plaintiffs."

164.     They seek to represent a class of New York City Lyft drivers who have been subject to contract violations and fraud claims set forth in this complaint for the period of in or about November 24, 2014 to November 5, 2015 as to the breach of contract and  November 3, 2015  to August 8, 2017 as to the fraud  (hereafter the "class action period.").

165.     The class action Plaintiffs, at various times, electronically accepted Lyft's contract in order to receive Lyft dispatches.

166.    The class action Plaintiffs are readily ascertainable since the identity, addresses, and time and pay records of each such Class member are determinable from the Defendant's records. Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

167.    Joinder of all Class members is impracticable. Upon information and belief, there are at least 30,000 or more Lyft drivers in New York City who could potentially be in the Class.

168.    The representative Plaintiffs' claims are typical of those claims that could be alleged by any member of the class. The relief sought by the Plaintiffs is typical of the relief that would be sought by each member of the Class in separate actions. All class action Plaintiffs were subject to the same tax and BCF-related policies and practices alleged herein and were parties to the same contracts, and victims to the same systemic deception by Lyft in the relevant period. The aforesaid policies and practices of Defendants similarly affect all of the Named Plaintiffs and the class action Plaintiffs. Named Plaintiffs and members of the class they seek to represent have sustained similar injuries and damages as a result of Defendant's unlawful acts and/or omissions.

169.    The representative Plaintiffs are fit to fairly and competently represent and protect the interests of the class action Plaintiffs. For the purposes of this action, the named Plaintiffs have no interests that conflict with those of the class action Plaintiffs. Representative Plaintiffs' attorneys have considerable experience with class action litigation.

170.    Disposition of the claims as a class action is superior to any other available means of adjudication for the foregoing reasons:

- Class members are workers who individually lack the necessary resources to effectively litigate against a corporate defendant;

- A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

34

- Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

- The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to the aforesaid barriers to and limitations of individual litigation, and;

- A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights as many Class members are still driving by for the Defendants.

- Numerous questions of law and fact are common to all Class members and predominate over those of any individual Class member, including:

- Whether Defendant breached its contract  with drivers from November 24, 2014 to November 3, 2015;

- Whether from November 3, 2015 to August 8, 2017 Defendant was engaged in fraud to enrich the Company at drivers' expense by misrepresenting as "Surcharges" or as an "Administrative Fee" taxes and BCF monies illegally deducted from drivers—which under Tax Law Lyft was not permitted to openly delegate to drivers by contract;

- Whether this fraud was collateral to the contracts entered by Class Members from November 3, 2015 to August 8, 2017;

- Whether Defendant by misrepresenting illegal Tax and BCF deductions as "Administration Fees" engaged in deceptive practices under N.Y. General Business Law § 349.

- Whether each driver trip records amounts to a discrete act of fraud for purposes of N.Y. General Business Law § 349.

- Whether Defendant's acts were willful within the meaning of N.Y. General Business Law § 349.

## FIRST CLAIM FOR RELIEF
### Breach of Contract
**(Brought by All Plaintiffs on Behalf of Themselves and the Class )**

171.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

172.    From November 24, 2014 to November 3, 2015, Defendant's actions and omissions, as alleged above, constituted independent and separate breaches of the contract entered into by Plaintiffs and those similarly situated and the Defendant. These violations include the unlawful deductions made from Plaintiffs' contractually due share of fares.

173.    That is, Defendant took Surcharges totaling 10% and approximately 11.4% from drivers' pay, in violation of the applicable contracts in effect during the relevant period.

174.    As a direct and proximate result of Defendant's breaches, Plaintiffs and others similarly situated, have been damaged in an amount as yet to be determined.

## SECOND CLAIM FOR RELIEF
### FRAUD
**(Brought by All Plaintiffs on Behalf of Themselves and the Class)**

175.    Plaintiffs on behalf of themselves and those similarly situated, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

176.    From in or about November 3, 2015 to August 8, 2017 , Defendant  deducted amounts from all Lyft New York City driver's pay in amounts equal to the amounts Lyft was required to pay for Sales tax and BCF Surcharges, while misrepresenting that such amounts were

merely "Surcharges" or other administrative fees, while also publicly claiming that such deductions did not result in drivers paying the cost of Lyft's sales tax obligations.

177.    This fraudulent misrepresentation was collateral to and extraneous to the contracts agreed to by the Plaintiffs, entitling them to damages in the amount equal to the tax and BCF surcharges deducted from their pay based on these misrepresentations.

### THIRD CLAIM FOR RELIEF
### Violation of N.Y. General Business Law § 349
### (Brought by All Plaintiffs on Behalf of Themselves and the Class)

178.    Plaintiffs on behalf of themselves and those similarly situated, repeat, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

179.    From in or about November 3, 2015 to August 8, 2017, Defendant engaged in the deceptive practice of misrepresenting deductions of amounts equal to the sales tax and BCF surcharge as merely "Surcharges" or other administrative fees, materially misleading drivers as to the purpose of these deductions, and injuring drivers as a result of this deceptive act, in an amount equal to the total amount of "Surcharges" or other administrative fees deducted from within each fare during this period.

### RELIEF SOUGHT

**WHEREFORE**, Plaintiffs on behalf of themselves and the class action Plaintiffs, request relief as follows:

A.  Designation of this action as a class action pursuant to Rule 23 of the Fed. R. Civ. P. for the purposes of the claims brought on behalf of the class action Plaintiffs;

B.  An award of damages for all breach of contract claims;

C.  An award of damages for all fraud claims;

D.  An award of damages for deceptive practices under N.Y. G.B.L. § 349;

E. An award of attorneys' fees;

F. Interest as provided by law;

G. Such other relief as this Court deems just and proper.

Dated: New York, New York
       April 13, 2020

Respectfully submitted,

MIRER MAZZOCCHI & JULIEN PLLC,

By: Jeanne E. Mirer
*Attorney for Plaintiffs*
150 Broadway, 12th floor
New York, NY 10031
(212) 231-2235
Jmirer@mmsjlaw.com

/s/ *Zubin Soleimany*
Zubin Soleimany, Esq.
New York Taxi Workers Alliance
31-10 37th Ave. Ste. 300
Long Island City, NY 11101
(718) 706-9892
zsoleimany@nytwa.org
*Attorney for Plaintiff*