UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------x

BIGU HAIDER and MD ISLAM, Individually, On Behalf of
All Others Similarly Situated, and as Class Representatives,

                                      Plaintiffs,

  -Against-

LYFT, INC.,

                                  Defendant.

-----------------------------------------------------------------------------x

Case No.
1:20-cv-02997-AJN

**<u>ORAL
ARGUMENT
REQUESTED</u>**

---

## PLAINTIFF' ISLAM'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
## MOTION TO COMPEL ARBITRATION

---

ZUBIN SOLEIMANY, Esq
New York Taxi Workers Alliance
31-10 37th Ave. Ste. 300
Long Island City, NY 11101
(718) 706-9892
Attorney for Plaintiffs

JEANNE E. MIRER, Esq.
RIA JULIEN, Esq.
Mirer, Mazzocchi, & Julien PLLC
1 Whitehall Street, 16th Floor
New York, NY 10031
(212) 231-2235
Attorneys for Plaintiffs

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................iii

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW ................................................................................................. 2

FACTUAL BACKGROUND ............................................................................................. 3

ARGUMENT ...................................................................................................................... 4

I.      PLAINTIFF AND OTHER NYC LYFT DRIVERS ARE A CLASS OF WORKERS
ENGAGED IN INTERSTATE COMMERCE..................................................................5

A.  PLAINTIFF AND   OTHER LYFT DRIVERS AS A CLASS ARE ENGAGED IN
INTERSTATE   COMMERCE..................................................................5

i.      Plaintiff And The Class Cross State Lines In Their Work And Are Thus Transportation
Workers Engaged In Interstate Commerce, Per Se ................................................ 5

ii.     All NYC Lyft Drivers Engage In Sufficient Interstate Trips To Support A Finding of
Engagement In Interstate Commerce ..................................................................... 6

iii.    Lyft Is Structured To Require Interstate Trips Of New York City Drivers As A Term And
Condition Of Working for Lyft, Thus Such Interstate Work Is Integral..........................8

iv.    Courts Have Held Transportation Workers To Be Engaged In Interstate Commerce Even At
Rates Below Lyft's Nationwide Interstate Trip Rate...................................................10

v.     Additionally, In Absolute Numbers Lyft and "Rideshare" Drivers Generally Nationally Are
Engaged In More Interstate Trips That National Bus Lines.......................................11

vi.    Lyft's Attempts To Go Beyond The Text Of The FAA And Caselaw To Define Engagement
In Commerce Do Not Aide Its Position.................................................................13

vii.   Plaintiff and The Class Perform Work Within The Flow Of Interstate Commerce ...........15

viii.  *United States v Yellow Cab* Does Not Weigh Against A Finding Of Flow of Commerce On
the Facts Presented...............................................................................................18

B. NYC LYFT DRIVERS ARE AN APPROPRIATE CLASS OF TRANSPORTATION
WORKERS FOR THE PURPOSES OF SECTION 1 EXEMPTION ..................................18

i.      Lyft Drivers Do Engage In Interstate Commerce In *A Manner Similar To* Seamen And
Railroad Employees..............................................................................................18

ii.     Plaintiff and the Class of Lyft Drivers He Seeks to Represent Are Members of a Properly
Defined Class of Transportation Workers Engaged In Interstate Commerce.................19

a.  Lyft Drivers Working In The New York City Market Is A Proper Delineation For The
Class Of Workers In This Case...........................................................................19

b.  Even If All Rideshare Drivers Comprise  The Class, All Rideshare Drivers Engage In
Interstate Commerce..........................................................................................20

i

iii.   The Exemption Within Section 1 Of The FAA Applies To Transportation Workers Involved In The Transport Of Both Goods And Passengers…………………………………………..21

III.   ABSENT APPLICATION OF THE FAA, PLAINTIFF IS NOT REQUIRED TO SUBMIT HIS CLAIMS TO ARBITRATION UNDER STATE LAW, GIVEN THE EXPRESS LANGUAGE OF THE CONTRACT…………………………………………………………………………..23

    A. LYFT'S ARBITRATION AGREEMENT, WHICH IS EXPRESSLY AND EXCLUSIVELY GOVERNED BY THE FAA, PRECLUDES COMPELLING ARBITRATION UNDER STATE LAW IF PLAINTIFFS ARE EXEMPT UNDER THE FAA…………………………………………………………………………………………..24

    B. NEW YORK LAW RENDERS NULL AND VOID ANY ARBITRATION PROVISION, SUCH AS LYFT'S, WHICH REQUIRES ARBITRATION OF DISCRIMINATION CLAIMS……………………………………………………………………………………..28

    C. NEW YORK PUBLIC POLICY OPPOSES FORCED ARBITRATION IN CASES OF INEQUALITY OF BARGAINING POWER. NEW YORK HAS NEVER AGREED THAT IF ARBITRATION AGREEMENTS ARE ENFORCED THAT CLASS WAIVERS MAY BE ALLOWED…………………………………………………………………………………..30

CONCLUSION...................................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Bensadoun v. Jobe-Riat,* 316 F.3d 171 (2d Cir. 2003) ............................................................. 3

*Badgett v Rent-Way, Inc.* 350 F. Supp 2d 642 (E.D. PA 2004) ............................................... 7

*Bates v. Long Island Railroad,* 997 F.2d 1028 (2nd Cir. 1993) ............................................ 18

*Brady v. Williams Capital Group, L.P.,* 14 N.Y.3d (2010)…………..……………………31, 32, 34

*Brennan v. Schwerman Trucking Co.,* 540 F.2d 1200 (4th Cir. 1976) ................................. 10

*Brown v. Nabors Offshore Corp.,* 339 F.3d 391 (5th Cir. 2003) ......................................... 19

*Burgos v. Northeast Logistics,* 2017 WL 10187756 (E.D.N.Y. Mar. 30, 2017) ............... 5, 28

*Capriole v. Uber Techs.,* 2020 U.S. Dist. LEXIS 90687 (N.D. Cal. May 13, 2020) ............. 18

*Circuit City v. Adams,* 532 U.S. 105 (2001) .................................................................. passim

*Cunningham v. Lyft, Inc.,* 2020 U.S. Dist. LEXIS 53653 (D. Mass. 2020) ..................... passim

*Dauphin v. Chestnut Ridge Transp.,* 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2019) ............ 8

*Davis v EGL Eagle Global Logistics LP,* 243. Fed. Appx 39, 2007 U.S. App. LEXIS 16324 ............. 27

*Diaz v. Michigan Logistics Inc.,* 167 F. Supp.3d 375 (E.D.N.Y. 2016) ................................. 28

*Gray v. Uber, Inc.,* 2019 U.S. Dist. LEXIS 72060 (M.D. Fla. Apr. 10, 2019)....................... 23

*Grice v. Uber Techs., Inc.,* 2020 U.S. Dist. LEXIS 14803 (C.D. Cal. Jan. 7, 2020)............... 23

*Guida v. Home Sav. of Am., Inc.,* 793 F. Supp. 2d 611 (E.D.N.Y. 2011) ............................... 3

*Gulf Oil Corp v. Copp Paving Co..,* 419 U.S. 186 (1974).............................................. 15, 22

*Hamrick v. Partsfleet,* 411 F. Supp.3d 1298 (M.D. Fla. 2019)............................................ 26

*Heller v. Rasier LLC,* No. cv-17-8545 (C.D. Cal Jan 7, 2020)............................................. 23

*International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC,* 702 F.3d 954 (7th Cir. 2012)......................................................................... 1, 5, 6, 7, 14, 21

*Jacobus v Colgate,* 217 N.Y. 235 (1916)…………………………………………………………31

*Kennedy v. Equity Transp. Co.,* 2015 U.S. Dist. LEXIS143565 (N.D.N.Y. Oct. 22, 2015) ................. 8

*Kowalewski v. Samandarov,* 590 F. Supp. 2d 477 (S.D.N.Y. 2008) .................................... 23

*Lenz v. Yellow Transp. Inc.,* 431 F.3d 348 (8th Cir 2005)................................................ 16, 17

*Marbury v. Madison,* 5 U.S. 137 (1803)....................................................................................31

*Maross Constr. v Central N.Y. Regional Transp. Auth.,* 66 NY2d (1985)……………………………..34

*Masson v. Ecolab. Inc.,* 2005 U.S. Dist. LEXIS 18022 (S.D.N.Y. Aug. 17, 2005) ............... 8

*Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am.,* 37 NY2d 91, 95, (1975)……………34

*Matter of Smith Barney Shearson v Sacharow,* 91 NY2d (1997)………………………………………34

*Morris v. McComb,* 332 U.S. 422 (1947) .................................................... 7, 8, 9, 10, 14

*New Prime v. Oliviera,* 139 S.Ct. 532 (2019) ..................................................... 1, 2, 3, 26

*Newton v. LVMH Moët Hennessy Louis Vuitton, Inc.,* 2020 N.Y. Misc. LEXIS 3288 (Sup. Ct. N.Y. Co. July 10, 2020) ......................................................................................................... 30

*Palcko v. Airborne Express Inc.,* 372 F.3d 588 (3rd Cir. 2004) ................................. 6, 17, 27

*Papetti v. Compagnie Nationale Air Fr.,* 97 CV 2921, 1998 U.S. Dist. LEXIS 14848 (E.D.N.Y. Aug. 14, 1998) ................................................................................................................ 15

*Pennsylvania Greyhound Lines v. Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Division 1063,* 193 F.2d 327 (3d Cir. 1952)........................ 22

*Ragucci v. Prof'l Constr. Servs.,* 803 N.Y.S.2d (2nd Dept.)……………………………………...………33

iii

*Ranieri v. Bell Atl. Mobile*, 304 A.D. 2d 353 (1st Dept. 2003)……………………………….…32, 33

*Rittman v. Amazon.com Inc.*, 2020 U.S. App. LEXIS 26310 (9th Cir. Aug. 19, 2020)

*Rittman v. Amazon.com Inc.*, 383 F. Supp. 3d 1196 (W.D. Wash. 2019)............... 1, 4, 15, 24, 25, 26, 27

*Rogers v. Lyft, Inc.*, No. 20-cv-01938-VC, 2020 U.S. Dist. LEXIS 61169 (N.D. Cal. Apr. 7, 2020) ....................................................................................................... ………16, 18, 20, 22

*Scaccia v. Uber Techs., Inc.*, 2019 U.S. Dist. LEXIS 99161 (S.D. Ohio June 13, 2019)...................... 23

*Sienkaniec v. Uber Techs.*, 401 F. Supp 3d 870 (D. Minn, 2019) ............................................................ 6

*Singh v. Uber Technologies Inc.*, 939 F.3d 210 (3d Cir. 2019) ...................................................... *passim*

*Smith v. Allstate Power Vac Inc.*, U.S. Dist. LEXIS 156805 (E.D.N.Y. Aug. 26, 2020)........................ 6

*Susquehanna Valley Cent. Sch. Dist. v. Susquehanna Valley Teachers' Assoc.*, 37 N.Y.2d (1975)…....32

*United States v. American Building Maintenance*, 422 U.S. 271 (1975) ............................................. 23

*United States v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998)............................................................. 26

*United States v. Yellow Cab. Co.*, 332 U.S 218 (1947)… ........................................................... 17, 18

*Valdes v. Swift Transp.Co.*, 292 F. Supp. 2d 524 (S.D.N.Y 2003).................................... 25, 26, 27, 28

*Waithaka v. Amazon.com, Inc.*, 404 F. Supp. 3d 335 (D. Mass. 2019) ................................. 1, 4, 15, 17

*Walling v. Jackson Paper Co.*, 317 U.S. 564 (1943) ..................................................... ………15, 17

*Walters v. Am. Coach Lines of Miami, Inc.*, 569 F.Supp.2d 1270 (S.D. Fla. 2008) ............................ 10

*Ward v. Express Messenger Sys.*, 413. F.Supp.3d 1079 (D. Colo. 2019).............................................. 6

## STATUTES

CPLR § 7515....................................................................................................................... 29, 30, 33

9 U.S.C. § 1 ........................................................................................................................... *passim*

9 U.S.C. § 4 ................................................................................................................................... 26

## OTHER AUTHORITIES

## MISC.

*https://www.aaamediation.org/find-mediator/* (Date accessed: Sep. 18, 2020)………………………..31

*About Greyhound,* https://www.greyhound.com/en/about/facts-and-figures ........................................ 13

*Amtrak FY 2019 Company Profile,* https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/nationalfact sheets/Amtrak-Corporate-Profile-FY2019-033120.pdf-- ...................................................................... 13

*Economic Research, Federal Bank of St. Louis, Passenger Train Miles, Class I Railroads for United States* (1920-1929) ............................................................................................................................. 24

*Economic Research, Federal Reserve Bank of St. Louis, Freight Train Miles, Class I Railroads for United States* (1920-1943)………………………………………………………………………..24

http://www.mta.info/press-release/lirr/lirr-time-performance-rises-three-year-high-2019-cancellations-major-delays-short ................................................................................................................................ 19

James A. Parrot & Michael Reich, *An Earnings Standard for New York City's App-based Drivers: Economic Analysis and Policy Assessment,*...................................................................................... 12

*LaGuardia Uber Rider Center among dining and retail amenties at NY & NJ airports,* https://www.mcmorrowreports.com/port-authority-airports-offer-new-uber-ride-center-more-food-retail. ...................................................................................................................................................... 18

Lyft, Inc. SEC Form 10-K for Year Ending Dec. 31, 2019 ................................................................ 12

*Profit margins for trucking companies on the rise.* AMERICAN TRUCKER (Mar. 7, 2018). ................... 11

Uber Technologies, Inc., Annual Report (Form 10-K) (Dec. 31, 2019)................................................. 13

Uber Technologies, Inc., Registration Statement (Form S-1) (December 31, 2019) ...................... 11, 16

*Webster's New International Dictionary* (1st Ed. 1909). …………………………………………...……14

Liyin Yeo, *Uber v. Lyft: Who's tops in the battle of U.S. rideshare companies.* SECOND MEASURE (website) available at https://secondmeasure.com/datapoints/rideshare-industry-overview/ (Last accessed: Sep. 14, 2020), attached as Ex. F to the Soleimany Aff. ……………………………………13

# INTRODUCTION

Plaintiffs Haider and MD Islam (hereafter "Plaintiffs"), on behalf of the class of New York City (hereafter "NYC") Lyft drivers, brings this class action to recover lost earnings unlawfully retained by Defendant Lyft in breach of contract with Plaintiffs and fraud in connection with Defendant's retention of such monies. Plaintiffs filed this case on the basis of his exemption from arbitration pursuant to the residual clause of Section 1 of the Federal Arbitration Act ("FAA"), which transportation "workers engaged in foreign or interstate commerce" from the scope of the act. 9 U.S.C. § 1 As the Supreme Court has held, workers may not be bound to arbitrate where the FAA is be inapplicable to them. *New Prime v. Oliveira*, 139 S. Ct. 532 (2019)

By Defendant's Motion to Compel Arbitration (Dkt. # 14) directed at Plaintiff Islam , Lyft improperly seeks to remove Plaintiff Islam's case from the Court and deprive him of class-based relief. However finding Plaintiff Islam within the residual clause is not only consistent with the scope of the exemption under *Circuit City v. Adams*, 532 U.S. 105 (2001) and *New Prime*, *supra*, but also with the rulings of the Third Circuit in *Singh v. Uber Techs. Inc.*, 939 F.3d 210 (3d Cir. 2019), the Ninth Circuit's ruling in *Rittman v. Amazon.com, Inc.,* 2020 U.S. App. LEXIS 26310 (9th Cir. Aug. 19, 2020), the First Circuit's decision in *Waithaka et al v. Amazon.Com, Inc.*, 966 F.3d 10 (1st Cir. 2020) and the Seventh Circuit's decision in *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012).

Here, Plaintiff Islam has pleaded significant facts to establish that he is part of a class of transportation workers who are engaged in interstate commerce. Plaintiff Islam, in fact, crosses state lines in his work in the tri-state area. As admitted by Defendant, Lyft drivers do so nationwide at a rate which was held to be sufficient *per se* by the Seventh Circuit to show engagement in interstate commerce, and Plaintiff Islam, as a New York City Lyft driver, does so at a rate twice

Lyft's reported national rate. Plaintiff Islam's interstate revenues also support such finding. Moreover Lyft's specific policies for interstate trips show them to be an inseparable, indeed, an integral part of Lyft's business. In addition to actual interstate trips, Plaintiff Islam and the class participate in the "flow of interstate commerce" by transporting passengers traveling interstate to airports and other transportation hubs within New York, which intrastate activity has been found sufficient for purposes of Section 1 exemption. Such facts apply to all NYC Lyft drivers, but even accepting Defendant's nationwide standard, arguendo, Plaintiff Islam and the class are exempt. In the absence of arbitration under the FAA, nor are Plaintiff Islam's claims subject to arbitration under state law, as the clear language of the Terms of Service agreement provides otherwise.

For the reasons stated herein, Plaintiff Islam requests this Court deny Defendant's motion. Denial of Defendant's motion would also be consistent not only with decisions of the First, Third, Seventh and Ninth Circuits, *supra*, but also with *Cunningham v. Lyft,* Inc., 2020 U.S. Dist. LEXIS 53653 (D. Mass. Mar. 27, 2020), which found Massachusetts Lyft drivers to be exempt from arbitration under the FAA and state arbitration, upon consideration of the same contracts and some of the same company policies at issue here.

## **STANDARD OF REVIEW**

Section 1 of the FAA provides that "nothing" in the FAA "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In *Circuit City v Adams*, *supra*, the Supreme Court limited the the residual clause's reference to "any other class of workers engaged in foreign or interstate commerce," to transportation workers engaged in interstate commerce. As the Court stated in *Singh*, *supra*, the applicability of the residual clause of § 1 is not merely "presumed to be [a] question [] for judicial determination." 939 F.3d at at 218 (citation omitted). Rather, *New*

*Prime* establishes that a court must be satisfied that this clause does not apply before making an order that the parties proceed to arbitration pursuant to §§ 3 and 4 of the FAA. *New Prime*, 139 S.Ct. at 537. Here, Plaintiff Islam's transportation worker status is uncontested and this motion turns on Plaintiff Islam and the class' engagement in interstate commerce.

In determining whether a Plaintiff is exempted from arbitration under the FAA, courts must apply a standard similar to that applicable to a motion for summary judgment. *Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir. 2003). As stated in *Guida v. Home Sav. of Am., Inc.*, 793 F. Supp. 2d 611, 613 n.2 (E.D.N.Y. 2011), "[w]hile it is generally improper to consider documents not appended to the initial pleading or incorporated in that pleading by reference in the context of a Rule 12(b)(6) motion to dismiss, it is proper (and in fact necessary) to consider such extrinsic evidence when faced with a motion to compel arbitration." Plaintiff Islam, as the party opposing Defendant's motion, presents the Court not only with arguments, but also documentary evidence, primarily Lyft documents, in support of his position.

## FACTUAL BACKGROUND

While documents supporting Plaintiffs' positions are attached to the annexed Affirmation of Zubin Soleimany, a recitation of the allegations in the Complaint concerning the interstate nature of their work as Lyft drivers, is warranted. Plaintiffs allege:

> • "At all times relevant, named Plaintiffs and members of the class they seek to represent were expected to and did drive passengers across state lines."
> • "Lyft's business model contemplates that Lyft's New York City Drivers are expected to perform interstate trips as part of their regular work."
> • "At all times relevant, Lyft's customer-facing websites have advised customers about the taxes and surcharges that are added to the fare for out-of-state trips. The current website states: 'Return tolls will be added to Westbound trips through the Holland Tunnel, Lincoln Tunnel, George Washington Bridge, Goethals Bridge, and Outerbridge Crossing. A $20 surcharge which ncludes tolls, as added to the fare on all trips between New York and New Jersey. If the trip begins in New Jersey and crosses the Verrazano Narrows Bridge, there is an additional $19 surcharge, for a total of $39 added to the price which again includes tolls.'

https://www.lyft.com/rider/cities/new-york-city-ny. In 2017 Lyft's customer facing website similarly states: "Heads up: $20 surcharge will be added to all trips between New York and New Jersey inclusive of tolls." https://www.lyft.com/cities/new-york-city-ny (Date accessed: May 30, 2017)."

• "New York City-based Lyft drivers routinely transport passengers between New York and New Jersey."

• "Specifically, in entering ride locations, passengers may choose any destination within 100 miles of their pick-up location, irrespective of the state of the destination."

• "Lyft's policies state that trips originating in New York City may extend as far as 100 miles."

• "Thus, New York City-based Lyft drivers may be dispatched to locations in New Jersey, Connecticut, or Pennsylvania."

• "Once a driver receives a dispatch, Lyft specifies the pick-up location, but withholds the drop-off location until the passenger has entered the vehicle."

• "Drivers are instructed that they will be penalized should they not accept a Lyft dispatch. If a driver refuses a trip after learning of the destination, Lyft considers such a refusal to be a "cancellation.""

• "Lyft has maintained a deactivation policy that stated that drivers' accounts could be deactivated for excessive cancellations. Specifically, a tutorial provided for Lyft drivers states 'If you cancel 15 or more of your last 100 accepted rides, not including passenger no-shows, your driver account could be at risk.' Accordingly, no driver had the option to exclude performing interstate trips, without risking further exposure to deactivation."

• "Thus, acceptance of interstate trips was a term and condition of Plaintiffs' access to Lyft dispatches."

• "Named Plaintiffs were required to perform interstate trips as a term and condition of his contract with Lyft."

• "Named Plaintiffs did in fact perform interstate trips." [Complaint, Dkt. #2, ¶¶ 43-55]

As argued below, on the allegations and the evidence appended hereto, a finding that Plaintiff Islam is exempt from arbitration pursuant to Section 1 of the FAA and not subject to arbitration under state law is warranted.

## **ARGUMENT**

The two primary questions at issue in this motion with respect to the FAA are (1) whether Plaintiff Islam and the class he seeks to represent are engaged in interstate commerce; and (2) whether NYC Lyft drivers are a class of transportation workers engaged in interstate commerce. As recent Circuit level precedent shows, even intrastate activity may qualify as engagement in interstate commerce. See e.g. *Cunningham, Waithaka, Rittman, supra.*

As argued herein, NYC Lyft drivers fit squarely the residual exemption of Section 1 of the FAA, as articulated in *Circuit City, supra*. Defendant's argument that the residual clause of the FAA must be narrowly construed and that Plaintiff Islam seeks to unlawfully expand it must fail. Indeed, as the Ninth Circuit recently held in *Rittman v. Amazon.com, Inc.*, 2020 U.S. App. LEXIS 26310, at *20-21 (9th Cir. Aug. 19, 2020), "Nothing in *Circuit City* requires that we rely on the pro-arbitration purpose reflected in §2 to even further limit the already narrow definition of the phrase "engaged in commerce." (holding intrastate last-mile activities within the flow of commerce). Indeed, this court should reject Defendant's unduly narrow view of transportation workers engaged in interstate commerce as unsupported by *Circuit City*.

## I. PLAINTIFF ISLAM, AND OTHER NYC LYFT DRIVERS ARE A CLASS OF WORKERS ENGAGED IN INTERSTATE COMMERCE

### A. PLAINTIFF ISLAM AND OTHER LYFT DRIVERS AS A CLASS ARE ENGAGED IN INTERSTATE COMMERCE

#### i. Plaintiff Islam And The Class Cross State Lines In Their Work And Are Thus Transportation Workers Engaged In Interstate Commerce, Per Se

Plaintiff Islam's interstate trips place him and the class squarely within the exemption. In *International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012) the Seventh Circuit held explicitly that "there is no basis in the text of §1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely; both sorts of worker are 'engaged in foreign or interstate commerce.'" *Id* (citation omitted). Thus, Lyft's argument that to be "engaged" in an activity means to be "typically" engaged in it for purposes of Section 1 exemption (Defendant's Brief in Support of Motion to Compel at 10, 11, 20) find no support in the statute or case law.

Courts within this Circuit that have addressed the scope of Section 1 have followed *Kienstra*'s approach. In *Burgos v. Northeast Logistics*, the Court found that "plaintiffs sufficiently

allege[d] that they were engaged in interstate transportation" where they did "drive across state lines in their employment as delivery drivers." 2017 WL 10187756 (E.D.NY. Mar. 30, 2017).[1] In *Smith v. Allstate Power Vac Inc.*, 2020 U.S. Dist. LEXIS 156805, at *12 (E.D.N.Y. Aug. 26, 2020), *quoting Palcko v. Airborne Express*, 372 F.3d 588, 593 (3d Cir. 2004), the Court cited with approval the Seventh Circuit's position in *Kienstra*. See also *Sienkaniec v Uber Techs*. 401 F. Supp 3d 870 (D. Minn. 2019), (holding that all Uber drivers engaged in interstate commerce even if only small numbers crossed state lines in their work and ordering Uber to provide discovery regarding the numbers of Uber drivers, both in Minnesota and nationally, who crossed state lines in their work (citing *Kienstra*, supra)). *See also*, *Ward v. Express Messenger Sys*., 413 F. Supp. 3d 1079 (D. Colo. 2019).

Thus, under *Kienstra*, and precedents which follow it, Plaintiff Islam is clearly engaged in interstate commerce as a Lyft driver transporting passengers between New York and New Jersey (see Complaint, paragraph 55). The same can be said for Lyft drivers in NYC more broadly, and even nationally. Thus, the fact of Plaintiff Islam's interstate trips and those of Lyft drivers nationally is dispositive of the question of whether they are engaged in interstate commerce without regard to the quantum of such trips.

ii.      **All NYC Lyft Drivers Engage In Sufficient Interstate Trips To Support A Finding of Engagement In Interstate Commerce**

A finding of Plaintiff Islam's engagement in interstate commerce is also supported by the percentage of interstate trips actually made by him and the class. In the instant case, Plaintiff Islam has performed interstate work on a regular basis as part of his regular duties, and estimates that

---

[1] In *Burgos*, the record support for this proposition was Plaintiffs' declarations averring that they had performed interstate trips. *See*, 15-cv-06850 (E.D.N.Y.)(CBA)(CP), at Dkt. Nos. 45-49. *E.g.*, Plaintiff Burgos' declaration noted that while working for Northeast Logistics he "frequently travelled outside of New York State to perform deliveries." Dkt. No. 45. Other plaintiffs could not recall specific dates when they travelled outside New York State, but noted that they were "required to be available" to do so. *Id*, at Dkt. # 46, 47.

such trips account for 4-5% of his total trips. Islam Decl. at ¶¶ 5, 6. Yet, even assuming Lyft's nationwide statistics that 2.05% of its trips cross state lines, on average 1 in every 50 trips made by Lyft drivers crosses state lines. Such is roughly the same proportion of interstate activity present in *Kienstra* and, thus, a finding of engagement in interstate commerce is warranted based on such statistics. To the extent that Lyft seeks to tie its fortunes to the broader "rideshare" industry, it bears noting that Uber's nationwide share of interstate trips is over 2.26% and its NYC share of interstate trips is 3.09%. See *Aleksanian et al. v Uber Technologies,* Inc., 19-cv-10308 (AJC) (SDNY), Dkt. 20, page 11, FN 3 (hereafter, "*Aleksanian*").

Further, federal case law interpreting identical language that workers "be engaged in interstate commerce" is instructive. Construing the requirement that motor carrier workers must, *inter alia*, be engaged in interstate commerce in order for them to be exempt from the Fair Labor Standards Act, (FLSA), Courts have found workers to be engaged in interstate commerce when only 1 or 2% of their trips involve crossing state lines. The Supreme Court, in *Morris v. McComb*, 332 U.S. 422, 433 (1947) found drivers for a trucking company to be within this exemption when 3.65% of the trips they performed were interstate trips. The Court noted that these trips, occurring throughout the year in "the normal operation of the business," were distributed indiscriminately among drivers predominately engaged in intrastate work; according to the Court, such interstate trips "were thus a natural, integral and apparently inseparable part of the common carrier service" at issue. *Id*. *See also*, *Badgett v. Rent-Way, Inc.*, 350 F.Supp.2d 642, at 655 (E.D. Pa. 2004) (Collecting cases, and noting circumstances in which even 1% of trips crossing state lines was sufficient for purposes of the motor carrier exemption). Other Courts, following *McComb*, *supra*, have found transportation workers to be "engaged in interstate commerce" when trips crossing state lines numbered in the range near or less than what Lyft claims its nationwide pool of drivers

perform. *See, e.g., Masson v. Ecolab. Inc.*, 2005 U.S. Dist. LEXIS 18022 (S.D.N.Y. Aug. 17, 2005) (Citing *McComb*, and collecting cases in which drivers were found not to be engaged in interstate commerce when, *e.g.*, 0.17% or 0.23% of their trips were interstate, and drivers couldn't reasonably expect to be assigned interstate work). Indeed, courts in the Second Circuit have continued to follow this standard. *See, e.g., Dauphin v. Chestnut Ridge Transp.*, 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009) (Considering the standard in *McComb* to determine whether plaintiff bus drivers were subject to the motor carrier exemption).

### iii. Lyft Is Structured To Require Interstate Trips Of New York City Drivers As A Term And Condition Of Working for Lyft, Thus Such Interstate Work Is Integral

Looking not only to the fact of interstate trips, and the percentage thereof—both of which are sufficient to establish a finding of engagement in interstate commerce here— another "way in which interstate travel can be a natural, integral and inseparable part of an employee's position is *when any employee may be required to perform interstate travel*, regardless of the actual time spent by employees individually on interstate travel. 'In the case of drivers, Courts often phrase the ultimate issue as *whether the employee could reasonably have expected to drive in interstate commerce.*'" *Kennedy v. Equity Transp. Co.*, 2015 U.S. Dist. LEXIS 143565, at *14-15 (N.D.N.Y. Oct. 22, 2015), *aff'd* 663 Fed. Appx 38 (2d Cir. 2016), *cert denied* 137 S. Ct. 2117 (2017). Under such analysis, a finding of engagement in interstate commerce is also warranted.

For Lyft drivers, interstate trips are a "natural, integral, and inseparable part" of their work. Based on the terms and conditions of their employment in the Lyft Terms of Service, as in *McComb* and *Kennedy*, *supra*, any NYC Lyft driver could reasonably have expected to engage in interstate commerce. This fact is made clear by Lyft's terms of service with its drivers. From paragraph 43 to paragraph 55 in the Complaint, Plaintiff Islam described how Lyft structured its NYC business

to make interstate trips an inseparable part of its regular business. For example, Lyft maintained a consistent policy, published in both driver pay documents and consumer-facing advertising, of imposing a $20 surcharge "on all trips between New York and New Jersey." (Compl. ¶ 45). *See also* Lyft's NYC homepage, https://www.lyft.com/rider/cities/new-york-city-ny, attached as Ex. A to Soleimany Aff. Also, Lyft consistently advertised to passengers on its rider-facing NYC website that Lyft provides service from NYC to "EWR," that is, Newark International Airport, and advises passengers that return tolls would be added to "westbound trips through or across the Holland Tunnel, Lincoln Tunnel, George Washington Bridge, Goethals Bridge, and Outerbridge Crossing." (Compl. ¶ 45); Ex. A to Soleimany Aff. All of those bridges and tunnels link New York and New Jersey. Other Lyft policies require NYC-based drivers, to routinely transport passengers between New York and New Jersey and/or Connecticut due to the fact that Lyft policies state that trips originating in NYC may travel as far as 100 miles. *See*, https://help.lyft.com/hc/en-us/articles/115012927607-Coverage-Areas attached as Ex. B to the Soleimany Aff. Furthermore, drivers are not aware of the drop-off location until the driver accepts the trip. Islam Decl., at ¶ 14. That these policies were published up-front on Lyft's most basic materials indicate that drivers could reasonably have expected to transport passengers in interstate commerce. Further Lyft's process for dispatching work, which simply assigns trips to the nearest available driver, leaves any driver capable of performing such work. *See* Islam Decl. at ¶ 12. As Plaintiff Islam noted, he received assignments for interstate work on a regular basis, throughout the years. *Id*. *See McComb*, at 433.

A refusal to drive such a trip would be counted as a "cancellation," and Lyft's policies state that drivers' accounts could be put "at risk" for excessive cancellation rates. Accordingly, no driver has the option to exclude performing interstate trips without risking further exposure to

deactivation. (Compl. ¶¶ 51-53; *see* Aug. 2019 Contract at §16) *See also*, Lyft Tutorial, "When to Cancel" (stating, "If you cancel 15 or more of your last 100 accepted rides, not including passenger no-shows, your driver account could be at risk."), attached as Ex. C to the Soleimany Aff. Indeed, as the substance of Plaintiff Islam's breach of contract claim illustrates, the refusal to perform an adequate number of trips (including those interstate and airport-connecting trips) could lead to serious consequences, and limitations on drivers' working hours and their earnings. Accordingly, performance of trips that cross state lines are not "incidental," but are actually "integral" to Lyft drivers' routine duties, as set forth in Lyft's policies and terms of engagement.

iv. **Courts Have Held Transportation Workers To Be Engaged In Interstate Commerce Even At Rates Below Lyft's Nationwide Interstate Trip Rate**

Analysis of Plaintiff Islam's percentage of earnings attributable to interstate trips also justifies finding Plaintiff and the class' engagement in interstate commerce. Notably, the Supreme Court has also looked to the percentage of a company's revenue that is derived from interstate work as part of this inquiry. *Harris v. McComb, supra*, at 427 (finding the employer to be engaged in interstate commerce where*, inter alia*, 4% of the company's revenue was derived from "transportation directly in interstate commerce). The Fourth Circuit Court of Appeals, citing to *Morris*, found a trucking company to be engaged in interstate commerce, where the percentage total of its revenue derived from interstate shipments over an eight-year period measured 9.7%, 8.1%, 1.2%, 5.1%, 1.5%, 2.7%, 3.3%, and 2.4%, for each year, respectively. *Brennan v. Schwerman Trucking Co.*, 540 F.2d 1200, 1203, n. 9 (4th Cir. 1976). *See, e.g.*, *Walters v. Am. Coach Lines of Miami, Inc.*, 569 F. Supp.2d 1270, 1284 (S.D. Fla. 2008) (Private coach drivers were found to be sufficiently engaged in interstate commerce where 4% of their employer's revenue was derived from interstate work, a "significant component.")

Plaintiff Islam estimates 20% of his total earnings from Lyft derive from interstate trips as such trips are typically significantly longer than the average Lyft trip. *See* Islam Decl. at ¶¶5-6. Further, as Lyft believes the applicable class involves all "rideshare drivers," regarding revenue, the named plaintiffs in *Aleksanian* who were able to access trip records found that 10.12% and 19.78%, respectively, of total trip revenues derived from interstate trips in a given period. These numbers are significant to understanding both the nature of the business and its involvement in interstate commerce. Numbers such as those Uber and Lyft have provided indicate that their interstate services are indeed an integral part of their business, and certainly not a revenue stream that they would be willing to give up. See Exhibit J of Soleimany Aff. (Italics added).*e.g.*, Uber Form S-1 at 38, where Uber states: "*We generate a significant percentage of our Gross Bookings from trips in large metropolitan areas and trips to and from airports. If our operations in large metropolitan areas or ability to provide trips to and from airports are negatively affected, our financial results and future prospects would be adversely impacted.*" It bears noting here, by way of example, that the average profit margin in the commercial trucking industry has recently ranged from 2.4% to 6%. *Profit margins for trucking companies on the rise*. AMERICAN TRUCKER (Mar. 7, 2018), available at https://www.trucker.com/business/article/21746996/profit-margins-for-trucking-companies-on-the-rise. (Last accessed: Sep. 14, 2020). The importance of such revenue to Lyft is thus crucial. Plaintiff Islam requests data relevant to this analysis by his Cross Motion for Discovery.

v.   **Additionally, In Absolute Numbers Lyft and "Rideshare" Drivers Nationally Are Engaged In More Interstate Trips That National Bus Lines**

In addition to the percentage of interstate trips NYC Lyft drivers make and the percentage of driver revenues derived from such trips, in absolute numbers, nationwide, *the rideshare industry provides more interstate trips than national bus and rail providers*

***combined. In this understanding of the term, rideshare services are more engaged in interstate commerce than Greyhound and Amtrak.***

The dominance of the "rideshare" industry in the ground transportation services in NYC and the tristate area cannot be understated. In February 2020, ridehailing or "rideshare" services in NYC provided an average of 749,129 trips *per day*, of which Lyft provided 184,122. *See*, *Taxi and Ridehailing Usage in New York City* (website), available at https://toddwschneider.com/dashboards/nyc-taxi-ridehailing-uber-lyft-data/ (Last accessed: Sep. 15, 2020). In 2018, Lyft provided 619,400,000 rides nationally. If the number of rides grew proportionally with Lyft's 67.66% increase in revenue from 2018 to 2019[2], then Lyft would have provided 1,034,398,000 rides annually. With 2.05% of such rides crossing state lines, Lyft would have provided 21,205,159 rides that crossed state lines in 2019. In other words, Lyft provided more interstate rides in 2019 than Greyhound, and the rideshare industry (Uber and Lyft combined) provided more interstate rides in 2019 than Greyhound and Amtrak combined. *See Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emples. v. Pa. Greyhound Lines,* 192 F.2d 310 (3d Cir. 1951) (holding Greyhound to be exempt under the FAA).

Further, Lyft argues that when analyzing the work of such drivers, the entire industry, and not just Lyft's activities, should be considered. (See Motion to Compel Arbitration, Dkt. # 14 Page 19). Accordingly, in 2017, Uber's revenue from its NYC operation was $2 billion. James A. Parrot & Michael Reich, *An Earnings Standard for New York City's App-based Drivers: Economic Analysis and Policy Assessment,* Ex. D at Soleimany Aff. at 44. The total number of app-dispatched trips in 2017 in NYC alone was 160 million—almost double the number of

---

[2] *See* Lyft, Inc. SEC Form 10-K for Year Ending Dec. 31, 2019, at 56 (showing revenue increasing from $2,156,616,000 in 2018 to $3,615,900,000 in 2019), available at https://investor.lyft.com/static-files/981ad93a-5d97-4f7f-8937-5682ca83cba7 (Last Accessed: Sep. 14, 2020), attached as Ex. I to the Soleimany Aff.

taxicab trips—*Id.* at 8. Uber's market share in 2017 was 66.5%. *Id.* at 42. Put differently, in 2017, Uber drivers alone completed more than one hundred million trips in NYC. Accepting Uber's contention that 3.09% of these were interstate trips would mean in 2017 more than 3 million interstate trips originated in NYC.

Looking to such data, there is no reason to believe that Lyft provides a significantly larger or smaller ratio of interstate trips than Uber's. Indeed, in 2019, the number of Uber interstate trips nationally was 36,344,000,[3] *not including* Lyft's 30% national market share.[4] This number of trips, even assuming one passenger per trip, involves the transportation of more than twice the number of passengers Greyhound Bus carried in 2019 in all trips both interstate and intrastate.[5] In 2019, the number of passengers on all Amtrak trips was less the number of all Uber interstate trips nationally, and this number is even larger as Uber trips often involved more than one passenger.[6] These facts are further indicative of the interstate nature of Plaintiff Islam's work.

### vi. Lyft's Attempts To Go Beyond The Text Of The FAA And Caselaw To Define Engagement In Commerce Do Not Aide Its Position

Lyft's shallow forays into dictionaries published before the passage of the FAA do not detract from the meaning of the term "engaged" in the FAA nor case law interpreting Section 1. To the contrary, the dictionaries cited by Lyft support Plaintiff Islam's position. Defendant cites a

---

[3] **Type**                    **2019**
    Global trips*              7,000,000,000
    U.S. Share (22%)**         1,540,000,000
    U.S. Interstate trips 2.36%***      36,344,000
*Uber Technologies, Inc., Annual Report (Form 10-K), at 57 (Dec. 31, 2019), attached as Ex. E to Soleimany Aff.
**Uber Technologies, Inc., Annual Report (Form 10-K), at 18 (Dec. 31, 2019), Ex. E to Soleimany Aff.

[4] *See* Liyin Yeo, *Uber v. Lyft: Who's tops in the battle of U.S. rideshare companies.* Second Measure (Aug. 17, 2020) (website), available at https://secondmeasure.com/datapoints/rideshare-industry-overview/ (Last accessed: Sep. 14, 2020), attached as Ex. F to the Soleimany Aff.
[5] *About Greyhound,* https://www.greyhound.com/en/about/facts-and-figures , attached as Ex. G to Soleimany Aff.
[6] *Amtrak FY 2019 Company Profile,* https://www.amtrak.com/content/dam/projects/dotcom/english/public/documents/corporate/nationalfactsheets/Amtrak-Corporate-Profile-FY2019-033120.pdf-- at 3, Ex. H to Soleimany Aff.

1909 version of Webster's New International Dictionary for the proposition that to be "engaged" in something means to be "occupied" or "employed at."[7] Plaintiff Islam fails to see how this supports Lyft's argument attempting to imply the addition of the word "typically" into Section 1 of the FAA. This definition is consistent with the Supreme Court's decision in *McComb* that drivers are engaged in interstate commerce if they perform interstate trips, *e.g.*, 3.65% of the time, as a natural, integral and inseparable part of the employment as drivers and where, as here, interstate trips are plainly contemplated by Lyft's policies. In any case, Lyft fails to mention that this same edition of Webster's also defined "engaged" as meaning "involved," and that the intransitive definition of "engage" within this edition is defined as "to take a part; to employ or involve one's self" and "to become involved." *Id.*[8] Such definitions, for their part, fit cleanly within the understanding of the term, as the Seventh Circuit applied it in *Kienstra*.

Lyft also refers to the *Century Dictionary & Cyclopedia* (1914) for a legal definition of interstate commerce near contemporaneous with the passage of the FAA. In this treatise, "interstate commerce" is defined as "commercial transactions between persons resident in different States of the Union, or carried on by lines of transport extending into more than one state." A commercial transaction is one which provides payment for a good or service. Applying these definitions to the Lyft business model, it is clear that Lyft drivers are engaged in interstate commerce. This is because (i) Lyft drivers provide lines of transport into more than one state; (ii) each trip sought by a Lyft customer is a commercial transaction where anyone with the Lyft App can seek to access a Lyft driver regardless of the state they are in and have the payment charged to their credit card.

---

[7] Lyft's cite to the 1911 edition of Black's Law Dictionary is essentially irrelevant as the definition of engaged it cites relates to French, not Anglo-American, law.

[8] Understanding "engaged" to mean "participating in" *(See, Webster's New International Dictionary* (1st Ed. 1909), at 842, (defining "engage" as "to take a part; to employ or involve one's self; to devote attention and effort" and "engaged" as "involved")*, Plaintiff, and Lyft or "rideshare" drivers generally, are clearly engaged in interstate commerce.

That is, whenever a resident outside of New York visits New York and seeks a ride with Lyft, that person is engaging in a commercial transaction between persons resident in different states of the union; and (iii) all of these commercial transactions take place on credit cards issued by banks in every state of the union. Thus, even under the definition of "interstate commerce" set forth in the *Century Dictionary & Cyclopedia* of 1914, Lyft drivers, who are paid a portion of the commercial transaction of each ride, are engaged in interstate commerce.

**vii.**     **Plaintiff and The Class Perform Work Within The Flow Of Interstate Commerce**

Yet another basis for a finding that Plaintiff Islam is engaged in interstate commerce is Plaintiff Islam's and the putative class' engagement in the "flow of interstate commerce." *See, e.g., Gulf Oil Corp. v Copp Paving Co.,* 419 U.S. 186, 195 (1974) (the phrase "engaged in commerce" "appears to denote only persons or activities within the flow of interstate commerce"). *See also Walling v. Jackson Paper Co.*, 317 U.S. 564, 568 (1943) (holding that goods remain in interstate commerce where there is a practical continuity of movement). On such theory, recently an increasing number of Circuits have held purely intrastate activities sufficient to show engagement in interstate commerce. *See Waithaka et al v. Amazon.Com, Inc., supra* (intrastate package delivery of out of state packages sufficient); See *Rittman v. Amazon.com, Inc.*, *supra*; See also *Cunningham, supra* (intrastate trips to Logan airport sufficient, where passengers travelling out of state). Moreover, the Eastern District of New York used the same reasoning to determine that a cargo handler who loaded planes bound for other states and countries was exempt from the FAA based on the flow of interstate commerce argument. *Papetti v. Compagnie Nationale Air Fr.,* 1998 U.S. Dist. LEXIS 14848, at *6 (E.D.N.Y. Aug. 14, 1998).

Here, Plaintiff Islam reports a sizable portion of his intrastate trips include connecting passengers to other forms of interstate transportation. (*See* estimates in the Islam Decl. at ¶¶ 7-11)

Although Lyft does not provide information about its revenues derived from trips in the flow of commerce, information provided by Uber may be instructive. From Uber's own data, a sizable portion of Uber's business involves trips and to from airports. Indeed, by its own admission, Uber "generated 15% of its Ridesharing Gross Bookings worldwide from trips that either started or were completed at an airport." Uber Technologies, Inc., Registration Statement (Form S-1), at 39 (April 11, 2019), Exhibit J to Soleimany Aff. Furthermore, Plaintiffs' declarations in *Aleksanian* indicate they perform routine trips to and from Grand Central Terminal, Pennsylvania Station and Port Authority Bus Station, which provide many interstate trips. *See Aleksanian et al v Uber Technologies Inc. et al,* 19-cv-10308, Dkt. # 34-1, 34-2. Thus, Plaintiff Islam's role in connecting passengers to international and interstate transportation hubs supports a finding of interstate commerce.

Nor is Defendant's citation to *Rogers v. Lyft, Inc.,* No. 20-cv-01938-VC, 2020 U.S. Dist. LEXIS 61169 (N.D. Cal. Apr. 7, 2020*)* persuasive (rejecting Plaintiff Islam's claim regarding flow of commerce through frequent trips to the airport or train stations). The better analysis is found in *Cunningham v Lyft*, *supra*, where the Court engaged in a more in-depth and comprehensive analysis of the factors to be considered in determining if Lyft drivers are transportation workers engaged in interstate commerce. There, the Court analyzed the factors cited as indicators of engagement in interstate commerce in *Lenz v Yellow Transp. Inc.* 431 F.3d 348 (8th Cir 2005) to determine whether an employee is so closely related to interstate commerce that he or she fits

within the § 1 exemption of the FAA.[9] The Court in *Cunningham*[10] noted that, as transportation workers, Lyft drivers qualified under most of the *Lenz* factors and engagement in the flow of commerce satisfied this inquiry,  reasoning:

> "[P]laintiffs' passengers traveling to or from Logan International Airport, <u>see</u> Cunningham Decl. [#37-7] ¶ 6; Mancho Decl. [#37-8] ¶ 4, are in the "continuity of movement" of a longer trip. Plaintiffs help facilitate that movement, as the first or last leg of the journey, including into or out of Massachusetts. See *Walling v. Jackson Paper Co.*, 317 U.S. 564, 568, 63 S. Ct. 332, 87 L. Ed. 460 (1943) (holding that goods remain in interstate commerce where there is a practical continuity of movement). Therefore, the Lyft drivers are part of the chain of interstate commerce, enabling their passengers to leave or enter Massachusetts. As such, the Lyft drivers are similar to Amazon's last mile delivery driver engaged in interstate commerce in *Waithaka*, 404 F. Supp. 3d 335, 2019 WL 3938053 at *4, and dissimilar to Doordash's restaurant delivery drivers in *Austin.*

> "In sum, weighing the *Lenz* factors and considering that some of Plaintiffs' passengers are in continuity of motion in interstate travel, the court finds that Plaintiffs are within a class of transportation workers excluded from coverage by <u>*Section 1 of the FAA.*</u> Accordingly, the FAA does not apply to their agreement with Lyft." 2020 U.S. Dist. LEXIS 53653, at *18-19.

On the facts presented, a similar result is warranted here. [11]   *See* Islam Decl.

---

[9] These factors are:

first, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties. (citations omitted). Lenz was only addressing transportation of goods.

[10] Lyft's attempts to undermine the Court's decision in *Cunningham* do not hold water. First Lyft claims that the Court did not attempt to define a class of workers or to look at their activity as a whole and only assessed the work of the specific plaintiff. This is not true. Second, Lyft faults the *Cunningham* Court for not addressing the reasoning in Yellow Cab, see infra. Plaintiff addresses this below as to the inapplicability of *Yellow Cab* to these cases. Third Lyft criticizes the *Cunningham* decision based on its citation to *Palcko v. Airborne Express*, 372 F.3d 588, 593 (3d Cir. 2004). But, the Court cited *Palcko* for the proposition that a worker can be engaged in interstate commerce even if the worker does not personally cross state lines.

[11] NYC Uber Drivers often also under the jurisdiction of the Port Authority of New York and New Jersey. (PANYNJ). The Port Authority of New York and New Jersey is an interstate compact authorized by the United States Congress in 1921. The Port Authority has jurisdiction over and oversees many of the bridges, tunnels, airports, and seaports, within the geographical jurisdiction of the Port of New York. The PANYNJ operates six bi-state crossings as well as the Port Authority Bus Terminal, the PATH train system, and five airports: LaGuardia Airport; John F. Kennedy Airport; New York Liberty Airport, Teterboro Airport and the Stewart International Airport. Uber Drivers from NYC service these airports and Uber has negotiated with these airports, especially LaGuardia, JFK and Newark to provide

**viii.** _United States v Yellow Cab_ **Does Not Weigh Against A Finding Of Flow of Interstate Commerce On the Facts Presented**

Further, Lyft's citation to _United States v Yellow Cab. Co._, 332 U.S 218 (1947) (where a local cab company's activity did not rise to the level of involvement in the stream of interstate commerce) is distinguishable on the facts. Although the characterization of being engaged in interstate commerce in _Circuit City_ referred to the test as being one of participating in the "flow of interstate commerce" used in the Clayton Act anti-trust law, the Court in _Yellow Cab, supra,_ was careful to confine this case to its facts. Indeed, the Court in _Yellow Cab_ expressly contemplated scenarios where interstate commerce sufficient to satisfy the anti-trust statute may be found based on cab pick and drop off to a station. See _Yellow Cab, supra_, at 232-233. Accordingly, _Yellow Cab_ does not actually address the argument regarding the flow of interstate commerce and is inapposite.

**B. NYC LYFT DRIVERS ARE AN APPROPRIATE CLASS OF TRANSPORTATION WORKERS FOR THE PURPOSES OF SECTION 1 EXEMPTION**

Defendant next makes several arguments aimed at the class of workers Plaintiff Islam purports to represent, and argues that they are not appropriate for Section 1 analysis.[12] All these arguments fail.

**i.** **Lyft Drivers Do Engage In Interstate Commerce In _A Manner Similar To_ Seamen And Railroad Employees**

---

a holding area for Uber drivers. Further the PANYNJ has established an Uber rider area on its property. https://www.mcmorrowreports.com/port-authority-airports-offer-new-uber-ride-center-more-food-retail. The airport surcharge which Uber Drivers charge is paid to the PANYNJ.

[12] Lyft's position that the proper class of rideshare drivers to evaluate for a class of workers engaged in interstate commerce is not shared by the Courts in reliance on _Capriole,_ 2020 U.S. Dist. LEXIS 90687 (N.D. Cal. May 13, 2020). In _Capriole_ the court considered only Massachusetts drivers. In _Rogers, supra_, the Court's analysis is flawed based on an incorrect application of a threshold level of interstate trips which as noted is not a basis for finding whether a class of workers engage in interstate commerce.

Lyft states that the notion of transportation workers should be interpreted with the same level of generality as "seamen and railroad workers." Defendant's position actually supports Plaintiff Islam's claim to the exemption. Railroad workers and seamen were known to engage in interstate commerce at the time of the passage of the FAA, regardless of whether the percentage of workers who ever crossed state lines was large or small or if some workers never crossed state lines. See *Brown v. Nabors Offshore Corp*, 339 F.3d 391 (5th Cir. 2003) (all seamen exempt from the FAA despite no interstate travel); *Bates v Long Island Railroad,* 997 F.2d 1028 (2nd Cir. 1993) (All railroad workers exempt from the FAA regardless of interstate travel). In the end, Lyft implies that the difference between Lyft drivers and seamen and railroad workers is that Lyft drivers move passengers short distances whereas railroad employees and seamen haul goods long distances. (Def. Brief at 16). This is a distinction without a difference in terms of whether Lyft drivers work in interstate commerce by crossing state lines, and in the flow of interstate commerce.

Indeed, the facts belie Lyft's assertions that railroads generally carry passengers long distances, as opposed to merely across state lines. As noted in *Bates v LIRR*, *supra,* none of the LIRR trips are interstate, however the LIRR carries 91.1 million passengers each year, almost three times as many passengers as Amtrak does in a year. http://www.mta.info/press-release/lirr/lirr-time-performance-rises-three-year-high-2019-cancellations-major-delays-short, attached as Ex. K to Soleimany Aff; Amtrak 2019 Corporate Profile (Ex. H to the Soleimany Aff). It is therefore clear that, regardless of the length of the trips driven by Lyft drivers, they do engage in interstate commerce in *a manner similar to* seamen and railroad employees.

ii. **Plaintiff Islam and the Class of Lyft Drivers He Seeks to Represent Are Members of a Properly Defined Class of Transportation Workers Engaged In Interstate Commerce**

    a. Lyft Drivers Working In The NYC Market Is A Proper Delineation For The Class Of Workers In This Case.

Next Defendant argues that Plaintiff Islam's reference to a NYC class of Lyft drivers is mistaken and the class of workers for Section 1 purposes must be nationwide. As an initial matter, neither of the Lyft cases, *Rogers, supra* (for a California class of drivers) nor *Cunningham, supra* (for a Massachusetts class of drivers), applies the nationwide standard to the class. Indeed, *Cunningham* examined Logan Airport activities specific to Massachusetts drivers.

Here, too, the specific market and geographic conditions are relevant to the inquiry. As this Court is aware, Plaintiff Islam brings this case on behalf of a class of all NYC Lyft drivers who lost pay because of the forced log-off policy Lyft imposed in June 2019. This forced log-off policy was only applied in NYC. As a result, the class of workers who would be at issue are only NYC Lyft drivers. Lyft also has geographically defined areas where Lyft drivers may work. (See Drive with Lyft—Cities, Lyft https://www.lyft.com/driver/cities (last visited Sep. 14, 2020). Certain rules apply only to drivers in one city and not to others. For example, in NYC, Lyft drivers fall into the class of Black Car Drivers regulated by the Taxi and Limousine Commission and must follow its rules regarding licensing, insurance and other relevant requirements including pay standards. These rules do not apply outside NYC. Just as the Court would not determine whether a particular railroad worker or worker on a boat individually engaged in interstate commerce, the sub-class of workers the Court in *Circuit City* addressed are those transportation workers who engaged in interstate commerce. The regularity with which Plaintiff Islam (and the class of NYC Lyft drivers he alleges he is typical of) performed interstate trips and trips connecting people to and from other transportation hubs, (*See* Islam Decl. at ¶16), allows the Court to examine the facts of the case before it.

b. <u>Even If All Rideshare Drivers Comprise The Class, All Rideshare Drivers Engage In Interstate Commerce.</u>

As noted above, even if the Court were to consider the scope of the class for interstate commerce purposes to be all Lyft drivers nationwide, Plaintiff Islam's claims would still be exempt from the FAA as, has been argued *supra*, the central inquiry, as adopted by the Seventh Circuit in *Kienstra* is whether workers reasonably expect to engage in interstate trips, as they do in accordance with Lyft's ride policy, etc. Further, the rationale in *Circuit City* regarding these transportation providers being involved in the "flow of interstate commerce," followed in *Cunningham v Lyft*, supports Plaintiff Islam's claim that all Lyft drivers are part of a class of transportation workers who are engaged in interstate commerce.

Thus, while Defendant misstates class scope of Section 1 exemption, rideshare drivers nationally meet the various standards to show engagement in interstate commerce. Noting that Uber claims its drivers in New York and nationwide perform 3.09% and 2.26% of their trips across state lines, respectively—combined with Lyft's assertion of a 2.05% interstate proportion of trips nationally— and that Uber and Lyft command 70% and 30% percent of the market share, respectively, then roughly 2.7% of all "rideshare" trips nationally cross state lines. As discussed *supra*, such a percentage would likely yield an even greater proportion of the industry's revenue. Accordingly, Plaintiff asserts all Lyft drivers are exempt from the residual clause of the FAA, and notwithstanding this, it is proper to consider NYC Lyft drivers as a class of workers engaged in interstate commerce.

### iii.     The Exemption Within Section 1 Of The FAA Applies To Transportation Workers Involved In The Transport Of Both Goods And Passengers.

Defendant's arguments regarding goods in interstate commerce must also fail, in light of *Circuit City*'s reliance on prior definitions of commerce encompassing goods and services, the Third Circuit's well-considered decision on this issue in *Singh*, and recent developments in circuits around the country. See *Singh*, 939 F.3d at 229 ("commerce" is "not normally limited to the

transportation of only physical goods.").   Further, both *Rogers* and *Cunningham* rejected this distinction previously argued by Defendant. See *Rogers, supra* at \*13 (stating, "it is settled beyond question that the transportation of persons is 'commerce'" for constitutional purposes" citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, (1974) for the definition of such as "persons or activities within the flow of interstate commerce.").   *See Cunningham, supra,*  at \*15-16.

As an initial matter, courts have found transportation workers transporting passengers to be within the exemption. See *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emples. v. Pa. Greyhound Lines,* 192 F.2d 310 (3d Cir. 1951) (holding Greyhound bus workers to be exempt).

In *Singh v Uber*, *supra*, the Third Circuit determined that the goods-versus-passengers dispute had no basis in the law, and was based only on *dicta* in *Circuit City.* 939 F.3d, at 223. Contrary to Lyft's argument, *Circuit City* does not carve out passenger transportation workers from the residual exemption, but builds its understanding of the term "commerce" on prior Supreme Court case law finding that the term extended beyond the transport of goods. Defendant illustrates perfectly the flaws in attempting to rely on such *dicta* by selectively quoting *Circuit City* in an attempt to turn that decision's use of an illustrative example into a further narrowing of the residual exemption. In its brief, Defendant cites *Circuit City's* statement that "[m]ost Courts of Appeals conclude the exclusion provision is limited to transportation workers, defined, **for instance**, as those workers actually engaged in the movement of goods in interstate commerce" while omitting the crucial phrase "for instance." 532 U.S. 105, at 112 (emphasis added) (internal citations omitted). The Court's discussion in *Circuit City* of prior Circuit cases does not provide a holding on the goods-passengers distinction, which was not at issue in *Circuit City*, but merely provides one illustration of workers that would be exempt from the FAA, as opposed to the view, which the Court rejected, that the exemption would apply broadly to all contracts of employment.

To the contrary, *Circuit City* grounded its understanding of the term "engaged in commerce" as "a term of art, indicating a limited federal jurisdiction" *id*, at 115-16, quoting *United States v. American Building Maintenance Industries*, 422 U.S. 271, 279-80 (1975). In *American Building Maintenance*, the Supreme Court held that to be engaged in commerce, within the meaning of the Clayton Antitrust Act of 1914, meant for a company to be "directly engaged in the production, distribution, or acquisition of goods *or services* in interstate commerce." 422 U.S. 271, at 283 (emphasis added). As passenger transportation services clearly fall within the meaning of such services, *Circuit City* cannot be read to create a goods-passengers distinction, where it grounded its understanding of commerce in cases such as *American Maintenance*, which explicitly defined the term to encompass the distribution of goods and services.

*Singh* addressed the issue most squarely and thoughtfully in the FAA context, and since that decision, most Court decisions on this issue have found that drivers transporting people in the flow of interstate commerce in exchange for money is just as much interstate commerce as transporting goods in exchange for money. Indeed, no Circuit Court, other than the Third Circuit, has ruled on this goods-versus-passenger distinction and the Court there reaffirmed its long line of cases recognizing that people are part of commerce among the states.[13]

Lyft's resort to the assumed legislative history surrounding the movement of goods fares no better than its other misreadings of *Circuit City*. While Plaintiff need not belabor this point, as a general matter, Lyft's claims that *Circuit City* "recognized the reality that [railroad employees]

---

[13] For several years after *Circuit City*, some courts found that unless drivers for transportation companies transported "goods" in interstate commerce they could not be exempted from the FAA under Section 1. These cases include *Heller v. Rasier LLC*, No. cv-17-8545 (C.D. Cal Jan 7, 2020), *Grice v. Uber Techs., Inc.,* No. CV, 2020 U.S. Dist. LEXIS 14803 (C.D. Cal. Jan. 7, 2020) *Scaccia v Uber Techs., Inc.*, U.S. Dist. LEXIS 99161 (S.D. Ohio June 13, 2019), *Gray v. Uber Techns Inc.*, , 2019 U.S. Dist. LEXIS (M.D. Fla. Apr. 10, 2019), and *Kowalewski v Samandarov*, 590 F. Supp.2d 477 (S.D.N.Y.2008). None of these cases engage with the issue as thoroughly as *Singh*, and no other Circuit Court has directly considered the issue since *Circuit City*.

were heavily devoted at [the time of the FAA's passage] to moving goods not people" (Lyft's Brief in Support) is neither grounded in the text of *Circuit City* nor in historical reality. In 1924, the year before the FAA's passage, passenger trains and freight trains travelled a similar number of miles, with class I passenger trains logging an average 46.1 million miles per month and class I freight trains logging an average 50.1 million miles per month. *Economic Research, Federal Bank of St. Louis*, *Passenger Train Miles, Class I Railroads for United States* (1920-1929), available at https://fred.stlouisfed.org/series/M0351AUSM456NNBR (date accessed Sep. 13, 2020); *Economic Research, Federal Reserve Bank of St. Louis, Freight Train Miles, Class I Railroads for United States* (1920-1943), available at https://fred.stlouisfed.org/series/M03045USM456NNBR (Date accessed: Sep. 13, 2020).

For all of the above reasons, Plaintiff Islam's claims and those of the class are not subject to arbitration as they are transportation workers engaged in commerce under Section 1 of the FAA.

## III. ABSENT APPLICATION OF THE FAA, PLAINTIFF IS NOT REQUIRED TO SUBMIT HIS CLAIMS TO ARBITRATION UNDER STATE LAW, GIVEN THE EXPRESS LANGUAGE OF THE CONTRACT

### A. LYFT'S ARBITRATION AGREEMENT, WHICH IS EXPRESSLY AND EXCLUSIVELY GOVERNED BY THE FAA, PRECLUDES COMPELLING ARBITRATION UNDER STATE LAW IF PLAINTIFFS ARE EXEMPT UNDER THE FAA.

Nor are Plaintiff Islam and the class bound to arbitrate their claims under state law. Indeed the clear language of the Terms of Service agreement provides otherwise, stating that the FAA, *and only the FAA,* governs the arbitration provision, and specifically disclaiming the application of other governing law to the arbitration agreement.

Indeed, the relevant arbitration provisions state unequivocally that "This agreement to arbitrate ("Arbitration Agreement") is governed by the Federal Arbitration Act." August 26, 2019 Agreement, Dkt. No. 16-1, at §17(a). The Agreement's choice of law provision specifically disclaims the application of any alternate source of law to the arbitration provision, stating,

"Except as provided in Section 17, this Agreement shall be governed by the laws of the State of California without regard to choice of law principles." *Id*, at § 21.

Lyft argues that this Court should compel arbitration even if the FAA doesn't apply because, in effect, in the absence of any governing law, the Court should still find the intent to agree to arbitration under other laws not contracted for. Having explicitly chosen to arbitrate under the FAA, and having explicitly disclaimed the application of alternate governing law to the arbitration provision, Lyft cannot now seek to apply state law to the arbitration provision when the FAA does not apply to transportation workers such as Lyft drivers. Rather, Lyft may only seek to arbitrate on the terms for which it contracted.

The language of Lyft's arbitration agreement is functionally identical to that of the Amazon Flex workers' contracts in *Rittmann*, *supra*, where the Ninth Circuit recently held that Amazon could not compel arbitration under state law where its arbitration agreement explicitly professed to be governed by the FAA and the contract's choice of law provision explicitly carved out application of state law to the arbitration provision. The Court in *Rittmann* found that the Amazon contract's explicit disclaimer of application of state law to the arbitration provision meant that "the plain language of the contract would prohibit applying Washington law to the arbitration provision" *Id*, at *32.

Lyft calls specifically for enforcement of terms similar to those denied enforcement in *Rittman* by citing simply inapposite case law. Lyft attempts to argue that "in the event that the FAA is inapplicable, the arbitration agreement and common law rules for selecting the governing law apply." *See*, Def's Brief, at 24, n. 10. Lyft's attempt to shoehorn this case's facts into the framework of *Valdes v. Swift Transp. Co.*, 292 F.Supp.2d 524 (S.D.N.Y. 2003), does not wash for multiple reasons. Lyft's citation of *Valdes* neglects to mention that *Valdes* explicitly held that

"***in cases brought under federal question jurisdiction*** where the FAA does not apply, and the arbitration agreement contains no choice-of-law provision, federal common law choice of law rules apply." 292 F.Supp.2d at 528 (emphasis added). First, this case was not brought under federal question jurisdiction, but under diversity jurisdiction, alleging only state common law claims. Second, Lyft's arbitration provision is not, as in *Valdes*, silent on choice of law; rather it *has* a choice-of-law provision which chooses to apply the FAA. Invalidity is not the same as silence; Lyft explicitly drafted an arbitration provision calling for a legal framework that is not applicable here. The Supreme Court has held that the Courts' authority to compel arbitration, however, "doesn't extend to all private contracts, no matter how emphatically they may express a preference for arbitration." *New Prime*, *supra*, at 537. Instead, the plain language of the FAA empowers Courts only to compel arbitration "in accordance with the terms of the agreement." 9 U.S.C. § 4. Going further, the arbitration provision even explicitly disclaims the application of alternate sources of law, besides the FAA, to the arbitration provision.

Looking to the language of the contracts at issue, the recent case of *Hamrick v Partsfleet*, 411 F. Supp.3d 1298, 1302 (M.D. Fla. 2019), is instructive. There, the arbitration agreement was governed by the FAA and the rest of the agreement was to be governed by State law. After the Court found that the plaintiff was an exempt transportation worker under the FAA, the Court addressed whether state law governed. The Court noted:

> However, the Arbitration Provision specifies that, "[t]his Arbitration Provision is ***governed** by* the Federal Arbitration Act." (Doc. 28-1 at 8 (emphasis added)). In interpreting contracts, "[w]hen two contract terms conflict, the specific term controls over the general one." *United States v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998). Here, the election of governing law generally applies to the Agreements, but the Arbitration Provision itself specifically elects to apply the FAA. Because the more specific provision controls, the Arbitration Provision cannot be interpreted pursuant to applicable state law and must rise or fall on the application of the FAA. As "transportation workers," Plaintiffs are exempt from arbitration under the FAA. Accordingly, this Court cannot compel arbitration pursuant to the parties' Agreements.

Given the similar provisions at bar, the same result is warranted here.

Further, the Court in *Hamrick* relied on *Rittman v Amazon.com Inc.,* 383 F. Supp. 3d 1196 (W.D. Wash. 2019), *aff'd*, as discussed *supra*, which also found that plaintiffs were exempt from the FAA and where the Court refused to compel arbitration pursuant to state law. Similar to the present case, the *Rittman* contract stated as to its governing principles as follows:

> These Terms are governed by the law of the state of Washington without regard to its conflict of laws principles. However, the preceding sentence does not apply to [the Arbitration Provision], which is governed by the Federal Arbitration Act and applicable federal law. At 1198.

In rejecting Amazon's argument that Washington state law applied, the Court found inapposite one of the cases Lyft relies on herein: *Valdes v Swift Transportation Co.*, 292 F. Supp 2d 524 (S.D.N.Y 2003). The Court in *Rittman* stated the cases Defendant cites (including *Valdes*) are inapposite, in that "none of the cases discuss a situation where the FAA is inapplicable *and the contract clearly indicates that state law is also inapplicable*" 383 F.Supp.3d at 1203) (emphasis original). That is, where, as here, the instant contract separates the arbitration provision from the rest of the agreement, arbitration may not be compelled under state law. State law may play no role with respect to arbitration, given the separation of the agreement.

At best, in the absence of the FAA, the contract presents ambiguity regarding what law may apply to the arbitration provision. *See Rittmann* (9th Cir), *supra*, at *32. Ambiguities are to be construed against the drafter, in this case Lyft. *See*, Cal. Civ. Code §1654. Indeed, it would have been fairly simple for Lyft to specify that in the event of the FAA's inapplicability, state law would govern the arbitration provision. *See*, *e.g. Palcko v. Airborne Express*, *supra*, (compelling arbitration where the agreement specified that Washington State law would apply in the event of the FAA's inapplicability). *See also*, *Davis v EGL Eagle Global Logistics LP*, 243. Fed. Appx 39, 2007 U.S. App. LEXIS 16324, (agreement stated Texas law would apply if the

FAA did not). Lyft chose not to do so. In ruling against Amazon, the Court in *Rittmann* specifically held that if the parties had intended Washington State law to apply, they could have said so (or remained silent), however, they did the opposite.

As in *Rittmann*, none of the cases cited by Lyft involve agreements where the choice of law provisions were specifically separated from the arbitration clause, as in this case and as found in *Rittman.* In *Burgos*, *supra*, as in *Valdes*, the contract contained no choice-of-law provision. 2017 WL 10187756, at \*4. The facts of *Diaz v Michigan Logistics Inc*., 167 F. Supp.3d 375 (E.D.N.Y. 2016), cited by Lyft, demonstrate a similar flaw. In *Diaz,* despite the contract stating that the FAA would apply to the arbitration agreement, the contract also very clearly stated that all claims would be arbitrated, <u>and it (as *Valdes*) contained no choice of law provision</u>. In the present case, not only does the contract restrict state law to all non-arbitration provisions, the case involves only state breach of contract claims. Because *Diaz* involved a federal question claim, the Court used federal common law to decide the choice of law issue. Federal common law, to the extent it exists, cannot be applied to these claims.

Plaintiff Islam has found no case to support Defendant's position that state arbitration applies to agreements like those signed by Plaintiff Islam. That is, Defendant cites no authority for the proposition, nor has Plaintiff Islam found any authority that allows for arbitration under state law where the contract expressly states that the FAA governs the arbitration provision and State law only applies to the other parts of the agreement. Thus, because there is no agreement to arbitrate under any law except the FAA under the contract, once this Court finds that the FAA does not apply to Plaintiff, it cannot order arbitration under New York Law.

**B. NEW YORK LAW RENDERS NULL AND VOID ANY ARBITRATION PROVISION, SUCH AS LYFT'S, WHICH REQUIRES ARBITRATION OF DISCRIMINATION CLAIMS**

Lyft claims that if Plaintiff Islam is exempt from the FAA he must arbitrate his cases in New York. Lyft bases this on the holding in *Valdes*, *supra*, applying federal common law to give jurisdiction to the state with the greatest interest in the litigation. Lyft asserts New York looks favorably on arbitration. In reality, the New York legislature has explicitly outlawed some mandatory arbitration provisions that include certain prohibited terms. N.Y. C.P.L.R. 7515. Assuming, *arguendo,* if the Court were to find Plaintiff Islam exempt from the FAA, and New York state were to then govern the Arbitration Agreement (which it should not), arbitration of Plaintiff Islam's claims under Lyft's agreement would still be prohibited under CPLR § 7515, which prohibits

> any clause in any contract which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination, in violation of laws prohibiting discrimination, including but not limited to, article fifteen of the executive law.

The statute defines mandatory arbitration at §7515(a)(3) as:

> a term or provision contained in a written contract which requires the parties to such contract to submit any matter thereafter arising under such contract to arbitration prior to the commencement of any legal action to enforce the provisions of such contract and which also further provides language to the effect that the facts found or determination made by the arbitrator or panel of arbitrators in its application to a party alleging discrimination, in violation of laws prohibiting discrimination, including but not limited to, article fifteen of the executive law shall be final and not subject to independent court review.

In this case, the arbitration agreement is a contract that plainly requires arbitration of discrimination claims under federal or state law. *See*, August 26 Agreement at §20(a). Accordingly, these expansive provisions within the arbitration agreement require mandatory arbitration of discrimination claims in violation of laws prohibiting discrimination to be arbitrated. Further, section 20(d) of the agreement renders the arbitrator's award final, and does not provide for independent judicial review of findings of fact or law. Therefore, such provisions are

considered prohibited under the CPLR. **CPLR 7515(b)(iii) further states that "the provisions" of such prohibited clauses shall be declared null and void**. *See Newton v. LVMH Moët Hennessy Louis Vuitton, Inc.*, 2020 N.Y. Slip Op. 32290(U), 2020 N.Y. Misc. LEXIS 3288 (Sup. Ct. N.Y. Co. July 10, 2020) (Applying CPLR 7515 retroactively to render null and void arbitration agreements that mandated arbitration of discrimination claims). Thus, the law renders this clause null and void under New York Law. In this case, the prohibited provision is a broad arbitration requirement for almost all claims, that encompasses Plaintiff Islam's breach of contract claims; accordingly, this provision is null and void and not enforceable under New York law.

Lyft will likely argue that the legislative intent behind CPLR 7515 was to prohibit the arbitration of discrimination claims only. However, Courts "do not resort to legislative history to cloud a statutory text that is clear." *Circuit City*, 532 U.S., at 119 (internal citation omitted). Here, the text of CPLR 7515 is plain on its face that it does not ban the act of compelling arbitration in specific cases, but instead, renders nulls and void arbitration provisions that violate its requirements. If the legislature sought to ban the arbitration of discrimination claims, rather than provisions that require arbitration of such claims, it could have easily drafted language to do so.

Plaintiff Islam recognizes that some Courts have interpreted CPLR 7515 not to apply to employees whose employers are covered by the FAA. However, when Plaintiff Islam and the putative class he represents are exempt from the FAA, the FAA should be out of the picture. New York Law CPLR 7515 thus renders Defendant's arbitration clause "null and void."


### C. NEW YORK PUBLIC POLICY OPPOSES FORCED ARBITRATION IN CASES OF INEQUALITY OF BARGAINING POWER. NEW YORK HAS NEVER AGREED THAT IF ARBITRATION AGREEMENTS ARE ENFORCED THAT CLASS WAIVERS MAY BE ALLOWED

While Plaintiff Islam has established that he is exempt from the FAA and that he should not be required to arbitrate at all, Plaintiff Islam points out that Defendant, in its effort to apply state law, have mischaracterized New York's willingness to allow for arbitration with a class action waiver. It is also a fundamental cornerstone of federal law that where there is a right, there is a remedy. *See, e.g., Marbury v. Madison*, 5 U.S. 137 (1803). This precept is also established New York law. *Jacobus v Colgate*, 217 N.Y. 235 (1916). In certain circumstances, the Court has looked at the individual facts on a case-by-case basis to determine whether compelling arbitration would violate public policy. In *Brady v. Williams Capital Group, L.P.,* 14 N.Y.3d 459, 467 (2010), the New York Court of Appeals held that case-by-case analysis was required to determine whether the costs of arbitration precluded plaintiffs from effective vindication of their statutory rights. Thus, even as New York courts uphold waivers of access to particular forums or procedures to resolve disputes, they have affirmatively found that these waivers will be restricted when they prevent meaningful access to *all* forums for a party to vindicate their rights. *Id*, finding that arbitration agreements will be limited when they include terms that would "preclude a litigant from vindicating his/her statutory rights in the arbitral forum[.]").

In the instant case, enforcement of the arbitration provision and its class waiver does not merely foreclose judicial resolution of Plaintiff Islam's complaints or raise questions of arbitration's cost-effectiveness for Plaintiff Islam, but would make it impossible to for him and potentially 30,000+ putative class members to have their claims adjudicated at all. The American Arbitration Association's website currently shows 134 arbitrators serving New York State. *See* https://www.aaamediation.org/find-mediator/ (Date accessed: Sep. 18, 2020) (Limiting search to all arbitrators within New York State).

Although Plaintiff Islam's claims involve no individual facts, but proceed from the universally applied policy of fraudulently deducting sales tax and the BCF surcharge from drivers' pay, enforcement of the arbitration provision and class waiver in this case would require 30,000+ individual arbitrations to be held on an identical issue. Even assuming that AAA could complete one arbitration arising from these claims every single business day, on top of their current caseload, it would take approximately 115 years to hear 30,000 cases. In these circumstances, enforcement of the arbitration clause does not provide the same remedy as a judicial forum, but serves, beyond any rational doubt, to foreclose the possibility of a remedy for all members of the putative class Plaintiff Islam seeks to represent. Thus, Defendant's arbitration agreement which, as applied in this case, mandates individual arbitration of 30,000+ identical claims, is void under New York law as contrary to public policy.

Defendant's brief also fails to engage meaningfully with New York state's public policy on arbitration, in large part merely summarizing cases in which New York courts analyze the FAA, which do not bear on New York law. While, as noted in *Ranieri v. Bell Atl. Mobile*, 304 A.D. 2d 353 (1st Dept. 2003), there is no general public policy in favor of class actions that would, standing alone, void an agreement to arbitrate, New York's presumption in favor of arbitrability is not unlimited. *Brady*, *supra* (recognizing that competing policy interests limit the "strong state policy favoring arbitration"). It is well established that courts will decline to enforce an arbitration agreement if it is contrary to the state's public policy, as expressed in both statutes and decisional law. *Susquehanna Valley Cent. Sch. Dist. v. Susquehanna Valley Teachers' Assoc.*, 37 N.Y.2d 614, 616-17 (1975).

New York statutes and case law do not evince the ironclad commitment to arbitration in all circumstances that Defendant claims. Notably, when not preempted by the FAA, the legislature

has decided to exempt certain claims from arbitration altogether. In a clear expression of public policy, the New York state legislature has limited mandatory arbitration in situations of significantly unequal bargaining power for decades: in 1984, the legislature enacted N.Y. Gen. Bus. Law § 399-c, prohibiting mandatory arbitration provisions in contracts for consumer goods. This law was passed in response to the widespread abuse of mandatory arbitration clauses. *Ragucci v. Prof'l Constr. Servs.*, 803 N.Y.S.2d 139, 143-44 (2nd Dept.) (summarizing legislative history). Customers often did not understand the clauses, and it led to customers being forced into inconvenient forums with "one-sided" arbitrators who favored merchants and, ultimately, resulted in consumers forfeiting claims. *Id.* More recently, the legislature has expanded this prohibition to include workplace claims; in recent legislation, the New York State legislature banned arbitration provisions that would require the arbitration of discrimination and sexual harassment claims. N.Y. C.P.L.R. § 7515**.** These laws plainly indicate that there are situations in which the state views contracts requiring arbitration as against public policy where, unequal bargaining power or the moral harm of the underlying claims renders arbitration an inappropriate forum. In the instant case, given both the similarities between Uber drivers and consumers as non-sophisticated, unrepresented parties, and the fact that requiring mandatory individual arbitration of 30,000+ identical claims would leave New York City Uber drivers without any remedy, ordering arbitration for the putative class members' claims would violate New York's public policy.

New York has never stated a public policy in favor of class waivers. *Ranieri* and *Tsadilas*, which Defendant cite, are inapposite, because they provide an expression of policy in regards to the FAA, as opposed to New York law, and neither address facts in which compelling arbitration would, doubtless, render adjudication of Plaintiff Islam's claims impossible within a century of filing. Looking to cases where the courts have actually expressed New York's public policy

regarding arbitration, under New York law, it becomes plain that the very same public policy considerations which led the court to favor arbitration decades ago, do not apply in this case. *See, e.g.*, *Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 49, (1997) (expressing a preference for arbitration "as a means of conserving the time and resources of the courts and the contracting parties"); *Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am.*, 37 NY2d 91, 95, (1975); *see also Maross Constr. v Central N.Y. Regional Transp. Auth.*, 66 NY2d 341, 345, (1985) (arbitration "is now well recognized as an effective and expeditious means of resolving disputes between willing parties desirous of avoiding the expense and delay frequently attendant to the judicial process").

The general preference for arbitration in New York is not dogma to be followed unquestionably in all cases, but expresses a public policy based on reasoned understandings of how arbitration *should* function. All the stated public policy rationales expressed in the above cited cases evaporate under the facts of this case. Conducting 30,000+ individual arbitrations on identical contractual issues will conserve no one's time or resources, not those of the contracting parties, nor the courts called upon to confirm 30,000+ individual arbitration awards. Nothing about arbitrating these claims individually over more than a century would be expeditious or would avoid the "expense and delay frequently attendant to the judicial process." Rather, compelling individual arbitration will simply serve to vitiate any remedy Plaintiff Islam may have. Under *Brady*, the courts must consider the case-by-case impact, that compelling arbitration would have, and whether this would conflict with the fundamental policy concern that rights, where violated, may be remedied. Because compelling individual arbitration here would frustrate both the policy goals that initially led New York Courts to favor arbitration and the policy goals allowing every right to be remedied, individual arbitration cannot be compelled under New York Law in this case.

## CONCLUSION

For the reasons stated herein and based on the evidence and the law, Plaintiffs submits that

Defendant's Motion to Compel Arbitration must be denied.


Dated: New York, New York
       September 22, 2020

                                    Respectfully submitted,

                                    MIRER MAZZOCCHI & JULIEN, PLLC

                                    By:/s/_____
                                    Jeanne Mirer and Ria Julien
                                    1 Whitehall, 16th Floor
                                    New York, NY 10004
                                    (212) 231-2235
                                    jmirer@mmsjlaw.com
                                    rjulien@mmsjlaw.com
                                    *Attorneys for Plaintiff*

                                    _/s/_____

                                    By: Zubin Soleimany
                                    New York Taxi Workers Alliance
                                    31-10 37th Avenue, Suite 300
                                    Long Island City, NY 11101
                                    718-706-9892
                                    zsoleimany@nytwa.org
                                    *Attorneys for Plaintiff*