USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Bigu Haider, *et al.*,

                           Plaintiffs,

           —v—

Lyft, Inc.,

                           Defendant.

20-cv-2997 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Rideshare company Lyft, Inc., seeks to compel arbitration of a driver's claims that it unlawfully collected state taxes out of his pay. The Federal Arbitration Act ordinarily requires courts to enforce arbitration provisions as written; however, it exempts contracts of employment of transportation workers. The Court must decide whether the driver's contract with Lyft falls within this exemption. The Court concludes that it does and thus denies Lyft's motion.

## I.    Background

In deciding motions to compel arbitration under the Federal Arbitration Act, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). This standard requires the Court to consider all relevant, admissible evidence before it and to draw all reasonable inferences in favor of the non-moving party. *Id.* The Court bases the following factual account on the evidence submitted in the parties' pleadings and affidavits.

Lyft operates a mobile-based ridesharing platform that matches riders with drivers for personal transportation.  Shah Decl., Dkt. No. 16, ¶ 3.  Mohammad Islam worked as a driver for Lyft from November 2014 through March 2020.  Islam Decl., Dkt. No. 30, ¶ 2.  To use Lyft's mobile phone application, he agreed to Lyft's terms of service.  Lieu Decl., Dkt. No. 19, ¶ 6. Lyft updated those terms repeatedly during Islam's employment, and with each update, he had to agree to the new terms to continue driving.  *Id.*; Shah Decl. ¶¶ 7–9.  The terms Islam agreed to included a provision requiring individual arbitration of any dispute with Lyft.  Shah Decl. ¶ 8; Terms of Service, Dkt. No. 16-1, § 17.

Although based in New York City, Islam frequently drove passengers across state lines within the greater New York City metropolitan area.  Islam typically took about four fares each week between New York and New Jersey while working for Lyft full time.  Islam Decl. ¶ 4.  He also made about two trips per month between New York and Connecticut.  *Id.*  In total, Islam estimates that four or five percent of his fares involved travel across state lines.  *Id.* ¶ 5.  These trips were typically longer than intrastate rides and accounted for a disproportionate share of Islam's work time and income.  He estimates that interstate fares made up about twenty percent of his total earnings.  *Id.* ¶ 6.  He frequently took fares to and from bus, train, ferry, and airport terminals in New York and New Jersey.  *Id.* ¶¶ 7–12.  Those amounted to about twenty-five percent of his total trips.  *Id.* ¶¶ 8, 10.

Drivers outside the tri-state area make interstate trips less frequently, but not by a huge margin.  Lyft's data shows that, nationally, a bit over two percent of its drivers' trips start in one state and end in another.  Muir Decl., Dkt. No. 18, ¶ 6.  That's about half the number Islam drove, or about two interstate fares each week for a full-time driver.  Based on Islam's experience—which Lyft does not dispute—one would expect those longer fares to account for

about ten percent of the typical driver's earnings.  In absolute terms, rideshare drivers make millions of interstate trips each year.  *See* Soleimany Decl., Dkt. No. 31, Ex. D–E, I–J; Muir Decl. ¶ 6; *see also* Opening Br., Dkt. No. 37, at 9.  Lyft has not provided the Court any data on the proportion of work time and earnings associated with interstate trips for drivers in specific regions.

Lyft's fare schedules, advertisements, and guidelines for drivers reflect that interstate travel is a regular part of its business.  Lyft permits drivers to drop passengers off up to a hundred miles outside the driver's coverage area—that is, the area where Lyft has approved the driver to pick passengers up.  Soleimany Decl., Ex. B.  In New York, Lyft advertises its service as a great way to "[h]ead out of town," with service to airports including Newark Liberty International Airport in New Jersey.  Soleimany Decl., Ex. A.  Its fare schedule includes a $20 surcharge for trips between New York and New Jersey, plus an additional $19 for trips starting in New Jersey that cross the Verrazzano-Narrows Bridge into Brooklyn.  *Id.*  Other courts have found that rideshare companies generate a significant portion of their earnings from trips to and from airports and that Lyft has reached a deal with Delta Air Lines to allow passengers to book rides directly through the airline's app.  *See Islam v. Lyft, Inc.*, No. 20-cv-3004 (RA), 2021 WL 871417, at *5 (S.D.N.Y. Mar. 9, 2021); *Capriole v. Uber Techs., Inc.*, 460 F. Supp. 3d 919, 930 (N.D. Cal. 2020); *see also* Soleimany Decl., Ex. I, at 9.  For an additional fee, Lyft offers riders priority pick-ups at airports.  Soleimany Decl., Ex. I, at 11.

Islam and another driver sued Lyft claiming that the company unlawfully deducted New York City sales tax and a Black Car Fund surcharge from drivers' earnings, while New York law instead requires those fees to be added to a rider's fare.  Compl., Dkt. No. 2, ¶¶ 3–5.  These fees amounted to a bit over ten percent of each driver's earnings.  *Id.*  Lyft followed its rival Uber in

discontinuing this practice in 2017.  *Id.*  Lyft now moves to compel arbitration of Islam's claims

under the Federal Arbitration Act and stay the case pending arbitration.  Dkt. No. 14.  Islam

cross-moves for discovery on the question of arbitrability, and Lyft opposes that motion.  Dkt.

Nos. 32, 40.

## II.    Discussion

"Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract.'"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011)

(quoting 9 U.S.C. § 2).  The FAA establishes "a liberal federal policy favoring arbitration

agreements."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018).  "But like most laws, this

one bears its qualifications."  *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 536 (2019).  Section 1

of the FAA "excludes from the Act's coverage 'contracts of employment of seamen, railroad

employees, or any other class of workers engaged in foreign or interstate commerce.'"  *Circuit

City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001) (quoting 9 U.S.C. § 1).  Courts, not

arbitrators, must decide whether an arbitration provision falls within this exemption.  *New Prime*,

139 S. Ct. at 537.

The Supreme Court has offered lower courts some guidance on scope of § 1: the

exemption covers transportation workers, whether or not employed as independent contractors.

In *Circuit City*, the Court faced the argument that the "interstate commerce" language in § 1

should be read to extend to the limits of Congress's commerce power.  *See Circuit City*, 532 U.S.

at 113.  That would reach too far, it said, and swallow the general rule.  Instead, the Court turned

to cases interpreting similar language in statutes enacted roughly contemporaneously with the

FAA.  Those cases held that "'engaged in commerce' 'appears to denote only persons or

4

activities within the flow of interstate commerce.'"  *Id.* at 118 (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974)).  The Court thus held that "Section 1 exempts from the FAA only contracts of employment of transportation workers."  *Id.* at 119.  In *New Prime*, the Court clarified that § 1 exempts "any contract for the performance of *work by workers*" engaged in interstate commerce—including independent contractors.  *Id.* at 541.

No circuit court has decided whether rideshare drivers fall within the exemption for transportation workers.  In *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 226 (3d Cir. 2019), the Third Circuit held that the pleadings alone failed to reveal whether Uber drivers were "engaged in interstate commerce or sufficiently related work" and remanded for discovery.  In *In re Grice*, 974 F.3d 950, 957 (9th Cir. 2020), the Ninth Circuit denied mandamus on that question, noting the dearth of circuit authority.  District courts have split.  *See, e.g.*, *Islam*, 2021 WL 871417 (yes); *Aleksanian v. Uber Techs. Inc.*, No. 19-cv-10308 (ALC), 2021 WL 860127 (S.D.N.Y. Mar. 8, 2021) (no); *Hinson v. Lyft, Inc.*, No. 20-cv-2209 (MHC), 2021 WL 838411 (N.D. Ga. Feb. 26, 2021) (no); *Gonzalez v. Lyft, Inc.*, No. 19-cv-20569 (BRM) (JAD), 2021 WL 303024 (D.N.J. Jan. 29, 2021) (maybe); *Capriole*, 460 F. Supp. 3d 919 (no);  *Cunningham v. Lyft, Inc.*, 450 F. Supp. 3d 37 (D. Mass. 2020) (yes); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904 (N.D. Cal. 2020) (no).

The Court begins with Lyft's threshold argument that only those who transport goods are engaged in interstate commerce.  An overwhelming consensus rejects this view.  *See, e.g.*, *Singh*, 939 F.3d at 222; *In re Grice*, 974 F.3d at 956; *Islam*, 2021 WL 871417, at *11; *Gonzalez*, 2021 WL 303024, at *3; *Cunningham v. Lyft, Inc.*, 450 F. Supp. 3d at 45; *Rogers*, 452 F. Supp. 3d at 914.  And for good reason.  In *Circuit City*, the Supreme Court looked to the meaning of the phrase "engaged in interstate commerce" at the time of the FAA's enactment.  *See Circuit City*,

532 U.S. at 117–18.  Though much has changed in the Court's commerce jurisprudence since 1925, the Court has never drawn a distinction between the interstate transportation of people and goods.  *See, e.g.*, *Edwards v. People of State of California*, 314 U.S. 160, 172 (1941) ("it is settled beyond question that the transportation of persons is 'commerce'").  To the contrary, when construing similar language in federal antitrust statutes, the Supreme Court has expressly held that the transportation of passengers between train stations "is clearly a part of the stream of interstate commerce."  *United States v. Yellow Cab Co.*, 332 U.S. 218, 228 (1947).  Nothing in *Circuit City* suggests the Supreme Court intended to depart from this long-settled rule.

And so the Court turns to whether Lyft drivers like Islam transport passengers within the flow of interstate commerce.  Looking only at Lyft drivers in the New York City area, this is not a close case.  Lyft markets its service as one allowing interstate travel.  Its fare schedule contemplates interstate travel.  And its drivers cross state lines on more days than not.  Lyft does not dispute Islam's evidence that interstate trips took a disproportionate amount of his work time and accounted for twenty percent of his earnings.  Interstate travel is a central component of Lyft's business in the tri-state area.  The Court has little trouble concluding that its drivers here are members of a class of workers engaged in interstate commerce, and thus that they fall within the FAA's exemption for contracts of employment of transportation workers.

The Court reaches the same conclusion when considering rideshare drivers as a class without regard to geography.  To begin with, the sheer number of interstate trips rideshare drivers make places them "within the flow of interstate commerce."  *Circuit City*, 532 U.S. at 118.  Based on Lyft's own data, its full-time drivers take passengers across state lines about twice each week on average.  Undisputed record evidence reflects that these trips are longer, more time-consuming, and more lucrative than intrastate trips.  These trips make up a significant

part of Lyft's business—based on Lyft's data, millions of interstate fares each year.  "From the perspective of an individual driver, these interstate trips are a regular component of his or her day-to-day work."  *Islam*, 2021 WL 871417, at *8.

Of course, not every rideshare driver takes passengers across state lines.  But that's true too for workers expressly covered by the exemption like railroad employees.  Many railroad employees work intrastate routes.  *See* Soleimany Decl., Ex. H, at 7.  Yet the Supreme Court has explained that contemporaneous understandings of that term included "all persons actually engaged in any capacity in train operation or train service of any description"—not only those who personally cross state lines.  *New Prime*, 139 S. Ct. at 543 & n.12 (quoting Act of June 1, 1898, 30 Stat. 424).  No class of transportation worker spends all its time straddling a state border, and "there is no basis in the text of § 1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely."  *Int'l Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012); *see Islam*, 2021 WL 871417, at *7.  Weekly interstate trips are enough.

The courts that have found rideshare drivers did not fall within the exemption for transportation workers have largely done so on an apparent instinct that their trips across state lines must be vanishingly rare.  *See, e.g.*, *Rogers*, 452 F. Supp. 3d at 916; *Hinson*, 2021 WL 838411, at *6; *cf. Capriole*, 460 F. Supp. 3d at 929 (finding that Massachusetts Uber drivers were not engaged in interstate commerce because less than a third of a percent of their trips crossed state lines).  That instinct may resemble reality in San Francisco, some two hundred miles from the closest land border with another state.  Not so much in New York, New Jersey, Connecticut, and many other parts of the country.  And Lyft's data belies it.  The factual record

here shows that Lyft drivers regularly take passengers across state lines.  The Court rejects Lyft's

invitation to substitute a vague notion of Lyft's general business model for the evidence before it.

      The great weight of authority further holds that interstate travel is not strictly necessary to

place a worker within the flow of interstate commerce.  *See, e.g.*, *Rittmann v. Amazon.com, Inc.*,

971 F.3d 904, 916 (9th Cir. 2020); *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 26 (1st Cir.

2020).  Both *Rittmann* and *Waithaka* held that last-mile delivery drivers qualify as transportation

workers because they form a vital link in the chain of interstate transportation.  "By virtue of

their work transporting goods or people 'within the flow of interstate commerce,'" those workers

"are 'a class of workers engaged in . . . interstate commerce'" even though they never personally

cross state lines.  *Waithaka*, 966 F.3d at 26 (alteration in original) (quoting *Circuit City*, 532 U.S.

at 118).  The Supreme Court reached essentially the same conclusion in *Yellow Cab*, 332 U.S. at

228: "When persons or goods move from a point of origin in one state to a point of destination in

another, the fact that a part of that journey consists of transportation by an independent agency

solely within the boundaries of one state does not make that portion of the trip any less interstate

in character."

      To be sure, *Yellow Cab* did not hold that all local activities of vehicles for hire involve

interstate commerce.  It distinguished between taxicab companies who contracted with railroads

and those who only infrequently drove passengers to train stations.  *See id.* at 228–32.  Thus,

taxicabs operating exclusively within one city do not engage in interstate commerce by making

"casual and incidental" trips to train stations.  *Id.* at 231.

      Lyft drivers' trips to air, train, and bus terminals are hardly incidental.  Lyft does not

dispute Islam's evidence that twenty-five percent of his trips began or ended at these hubs of

interstate travel.  Nor does it offer any evidence that this proportion is atypical.  Lyft's corporate

disclosures reflect marketing partnerships with airlines and hotels, and it offers riders priority pick-ups at airports with a paid subscription.  Like the taxicab companies in *Yellow Cab* that contracted with local train stations, Lyft has "worked to integrate its transportation services" with at least one air carrier.  *Islam*, 2021 WL 871417, at *5.  Both the quantity and nature of Lyft's connections to hubs of interstate travel lead the Court to conclude that its drivers engage in interstate commerce even when they do not personally cross state lines.  They "form a part of the channels of interstate commerce, and are thus engaged in interstate commerce as we understand that term."  *Rittmann*, 971 F.3d at 917.  This Court thus follows several others in holding that workers like Islam who "facilitate [interstate] movement, as the first or last leg of the journey," are engaged in interstate commerce.  *Cunningham*, 450 F. Supp. 3d at 46; *see Rittmann*, 971 F.3d at 917; *Waithaka*, 966 F.3d at 26.

Lyft drivers regularly transport passengers across state lines.  More regularly still, they transport passengers to and from hubs of interstate travel.  A wealth of precedent reflects that either alone would be enough to conclude that they are engaged in interstate commerce, and that their contracts with Lyft thus fall within the FAA's exemption for contracts of employment of transportation workers.  The Court concludes that Islam's contract is exempt from the FAA.

The Court stresses that it reaches this result on the factual record before it.  That record reflects that a significant portion of Lyft's business—both in the New York area and nationally—involves interstate transportation.  The Court is mindful of the Third Circuit's opinion in *Singh*, 939 F.3d at 226, which held that a rideshare company was not entitled to compel arbitration but remanded for discovery.  Nothing in this order shall prejudice Lyft from renewing its motion if a more developed factual record shows that Islam is not among a class of workers engaged in interstate commerce.

**Conclusion**

Based on the record presently before the Court, rideshare drivers like Mohammad Islam regularly transport passengers across state lines.  These are "activities within the flow of interstate commerce," and so their contracts with Lyft fall within the Federal Arbitration Act's exemption for contracts of employment of transportation workers.  *Circuit City*, 532 U.S. at 118. The Court thus DENIES Lyft's motion insofar as it seeks to compel arbitration under the Federal Arbitration Act.  The Court addresses Lyft's request to compel arbitration under state law and other pending motions by separate order.[1]

SO ORDERED.

Dated: March 31, 2021
        New York, New York

_____
            ALISON J. NATHAN
        United States District Judge

---

[1] The Court notes that another court in this district recently decided the same question in another case between the same parties, holding that rideshare drivers fall within the § 1 exemption.  *See Islam*, 2021 WL 871417, at *12.  Because neither party has raised the issue of collateral estoppel, and because the Court reaches the same result, it declines to decide the preclusive effect of *Islam* at this juncture.